**Sean C. Chapman**
**Law Offices of Sean C. Chapman, P.C.**
100 North Stone Avenue, Suite 701
Tucson, Arizona 85701
Telephone: (520) 622-0747
Fax: (520) 628-7861
Arizona State Bar No. 012088
Attorney for Defendant Edwards
sean@seanchapmanlaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | CR 19-00184-JGZ-LCK |
| )   Plaintiff,    ) | |
| )    ) | **MOTION TO SUPPRESS** |
| v.    ) | **STATEMENTS** |
| )    ) | |
| Kyle Edwards,    ) | |
| )    ) | |
| Defendant.    ) | |
| ) | |

It is expected that excludable delay under Title 18, United States Code, § 3161(h)(1)(F) will occur as a result of this motion or an order based thereon.

The Defendant, KYLE EDWARDS through undersigned counsel, Sean C. Chapman of THE LAW OFFICES OF SEAN C. CHAPMAN, P.C., pursuant to the Fifth Amendment of the United States Constitution and Rule 12.(b)(3)(C) of the Federal Rules of Criminal Procedure, respectfully moves this Court for an order suppressing his statements as evidence at trial. This motion is made for the reasons set forth below and will be supported by evidence introduced at the hearing on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    FACTS

Mr. Edwards is accused of distributing child pornography and knowingly accessing child pornography, on April 28, 2016. (Doc. 1)  The facts leading to his indictment are as follows.

On April 28, 2016, agents from the Department of Homeland Security used an automated tool to search for IP addresses that accessed a BitTorrent network used to download child pornography. According to agents, the tool downloaded 15 viewable files that contained child pornography, from an IP address later determined to be associated with Edwards.

Approximately one month later, on May 31, 2016, agents executed a search warrant at Edwards's home in Marana, Arizona. The house is just over 1,500 square feet, with 3 bedrooms and 2 bathrooms.  Although Mr. Edwards was being investigated for a non-violent crime, has no prior criminal history, and no history of violent behavior, eighteen law enforcement officers gathered at 5:30 a.m. for a pre-raid briefing. At 5:55 a.m. HSI Special Agent Jeffery Armstrong "led a procession of law enforcement vehicles" to Edwards's home. At exactly 6:00 a.m., when the warrant became valid, agents approached the front door. Armstrong rang the doorbell and knocked loudly for "several seconds," until Edwards opened the door. He was asked questions about other occupants, weapons, dogs and/or children, which he answered, and then, as instructed, Edwards waited outside while agents entered the house to commence their search.

After only a few minutes, Armstrong brought Edwards into the master bathroom and told him to "take a seat" on the bathtub. Agent Katherine Gamble was also in the bathroom,

the door of which was left "cracked open."[1]  Armstrong told Edwards that he was not under arrest and that he was free to leave for work at any time. These statements, however, were belied by the other fifteen, armed agents currently searching Edwards's home[2] and by his confinement in a small bathroom with two uniformed and armed agents.

Armstrong turned on his digital recorder at 6:10 a.m. He initially asked Edwards the personal history questions on ICE Form 73, but when that was completed, Armstrong asked Edwards if he would answer questions about "a child molestation case." Edwards agreed, indicating that he didn't understand why the agents were searching his home. Armstrong asked some questions about Edwards's roommate but quickly segued to internet usage in the home, including obtaining Edwards's username and password for his internet account. The interrogation elicited incriminating statements the Government now intends to use against Edwards in this child pornography case. A transcript of the interview is filed under seal, as Exhibit 1.

Approximately 35 minutes into the questioning and after already providing incriminating answers, Mr. Edwards stated, "I probably should get a lawyer or something… ." (Ex. 1, p. 28, line 1205.) Armstrong apparently believed he needed clarification as to whether Edwards was invoking his right to counsel by asking several additional questions, until Edwards finally responded, "Yea, I guess I should probably have an attorney." (Ex. 1, p. 30, line 1293.) That first interview concluded at 6:43 a.m. (Ex. 1, p. 31, line 1308.)

---

[1] A short while into the interrogation, Gamble was replaced by a male officer, Bob McCarthy, at Mr. Edwards's request.

[2] One agent remained outside, near his "fully marked police Tahoe" to ensure that the suspects inside would see them.

Armstrong left the bathroom, but McCarthy remained inside with Edwards, who was not permitted to leave. As the search was continuing throughout the house, Edwards conversed with McCarthy about the availability of counselling services. McCarthy called Armstrong back into the bathroom. He turned on his recorder at 6:50 a.m. and read Miranda rights from a form. A transcript of this second interview is filed under seal as Exhibit 2.   Armstrong read the waiver aloud to Edwards, who "ultimately" signed the form but never verbally acknowledged waiving his constitutional rights. The Statement of Rights and Waiver form is attached as Exhibit 3. Edwards instead asked if "this mean[s] I can never get a lawyer? (Ex. 2, p. 4, line 96.) Armstrong clarified that the purpose of the form is to allow Edwards to speak to him without a lawyer present at that moment. He said:

> If you don't want to sign it and give us a verbal, then we can go that route. That's to you. As long as you – you've said you understood the first part. If you're willing to, uh, accept the second part then we can continue. I'll just annotate on there that you didn't want to sign it, but you understood it and you were willing to waive. It's up to you. You need another drink of water?

(Ex. 2, p. 4, lines 114-119.) Agent McCarthy then interjected, to advise Edwards he would not be able to speak to Armstrong unless he signed the waiver form. The form was signed at 6:58 p.m. (Ex. 2, p. 5, lines 148-49.) Armstrong then continued his 9-minute interrogation of Edwards, which ended when Edwards stated he did not want to talk anymore. (Ex. 2, p. 9, line 349.) The Government seeks to introduce against Edwards the statements he made during this second interview.

All of Edwards' statements were obtained in violation of Edwards' Fifth Amendment rights and, as a result, they must be suppressed. United States v. Gomez, 725 F.3d 1121, 1125-26 (9th Cir. 2013), citing Harris v. New York, 401 U.S. 222, 224-26 (1971).

## II.   LAW

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The "essence" of the right against self-incrimination "is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." Culombe v. Connecticut, 367 U.S. 568, 581 (1961).

In Miranda v. Arizona, the Supreme Court acknowledged the pervasive compulsion of custodial interrogation, a context that generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he does not otherwise do so freely. 384 U.S. 436, 467 (1966). The Court therefore adopted prophylactic procedural measures to guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations. Id. at 444-45. These protections are constitutional in nature and thus cannot be abrogated by statute. See Dickerson v. United States, 530 U.S. 428 (2000).

The rule requires that interrogation initiated by law enforcement officers after a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be preceded by Miranda warnings. Miranda, 384 U.S. at 444. Custodial statements made in the absence of Miranda warnings are not admissible against the defendant at trial. Id. at 444.

A court may admit statements elicited after Miranda warnings if the agent secures a valid waiver. To admit such statements, the prosecution bears the burden of proving by a preponderance of the evidence that the defendant waived his Miranda rights and that the waiver was voluntary. See Colorado v. Connelly, 479 U.S. 157, 158 (1986).

*A.     Mr. Edwards was In Custody at 6:00 a.m., Prior to His First Interview*

There is no question that Mr. Edwards was not given Miranda warnings prior to or during his first interrogation by Armstrong. The "touchstone" for Miranda warnings is whether the suspect was in custody when interrogated. United States v. Barnes, 713 F.3d 1200, 1205 (9th Cir. 2013), citing Rhode Island v. Innis, 446 U.S. 291, 300 (1980). To determine whether an individual was in custody, the Court must examine the totality of the circumstances. See Thompson v. Keohane, 516 U.S. 99, 112 (1995). The Court then asks whether a reasonable person in those circumstances "would have felt he or she was not at liberty to terminate the interrogation and leave." Id; see also United States v. Bassignani, 575 F.3d 879, 883–84 (9th Cir. 2009), quoting United States v. Booth, 669 F.2d 1231, 1235 (9th Cir.1981).

Before conducting the analysis, it is important to point out that Armstrong obviously considered Edwards to be in custody from the moment of their initial encounter.  Armstrong filled out the Waiver form and signed it, along with Agent McCarthy and Mr. Edwards. His own handwriting memorializes that Mr. Edwards was taken into custody at 6:00 a.m. on May 31, 2016. Armstrong affirmed this fact when he asked Mr. Edwards to sign the waiver. (Ex. 2, p. 3, lines 86-88.)

In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), the Ninth Circuit for the first time applied this standard to the "challenging" analytical framework of interrogations conducted within the suspect's home. The Court struggled with this question:

> If a "person is interrogated inside his own home but is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be 'free' to leave is a hollow right of the one place the suspect cannot go is his own home.

Id. at 1083. The Court also considered the coerciveness that occurs when the suspect's "home is crawling with law enforcement agents conducting a warrant-approved search." Id. "He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." Id. The Court's concerns were extant in this case. Edwards had nowhere to go at 6:00 in the morning, after he'd been awakened from his night's sleep and escorted outside still in his underwear, and then within 10 minutes taken back inside where he was crammed into a small bathroom with two agents, the door barely ajar, and told to sit on the bathtub. And just outside the bathroom, sixteen uniformed, armed agents were searching every room of his house.

The question of a "police dominated atmosphere" was considered in Miranda as an essential salient feature that would deprive a suspect of his freedom of action. Miranda, 384 U.S. at 445 (stating that the salient feature was that the suspect was "cut off from the outside world"). For this reason, the Craighead Court determined that the "police dominated atmosphere" would be the benchmark for custodial interrogations in locations outside of the police station. 539 F.3d at 1083 (citations omitted.) Applying this analysis to Craighead, the Court set forth a non-exhaustive list of factors for consideration: (1) the number of law

enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. Id. at 1084.

1. The Number of Law Enforcement Personnel

The Craighead Court explained why the number of law enforcement personnel, and whether they were armed, is an important consideration:

> When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. Similarly, when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. The suspect may also believe that the large number of officers was brought for the purpose of preventing his departure. In addition, if the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably believe that his home is no longer safe from the threat of police force. In short, the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere.

Id. at 1084-85 (emphasis added); see also, Orozco v. Texas, 394 U.S. 324, 325-26 (1969) (Miranda warnings required because several officers questioned the suspect in his bedroom at 4 a.m.); United States v. Mittel–Carey, 493 F.3d 36, 38, 40 (1st Cir. 2007) (finding that warnings were required because eight officer maintained physical control over the defendant and interrogation occurred at 6:25 a.m. and lasted up to two hours); United States v. Revels, 510 F.3d 1269, 1270 (10th Cir. 2007) (Miranda warnings required because defendant was awoken at 6 a.m. by seven officers, placed in handcuffs and ordered to sit while officers

executed search warrant); Sprosty v. Buchler, 79 F.3d 635, 641, 638, 642 (7th Cir. 1996) (warnings required where five officers, one of whom was visibly armed and in uniform, surrounded the suspect in two police cars).

In Craighead, the Court found that when eight law enforcement officers, representing three different law enforcement agencies, entered the defendant's home, he reasonably felt that "his home was dominated by law enforcement agents and that they had come prepared for confrontation." Craighead, 539 F.3d at 1085. Similarly here, the law enforcement personnel who entered Mr. Edwards home were from three different agencies: Homeland Security, Immigration and Customs Enforcement, and the Marana Police Department. All were wearing "attire clearly identifying themselves as police officers." A procession of law enforcement vehicles parked just outside Mr. Edwards' home, including a "police Tahoe" intentionally positioned "in front of the residence so that if the subjects inside were to look out, they would see a uniformed police office and his/her fully marked patrol vehicle." Seventeen agents entered Mr. Edwards's home to execute the search warrant. These circumstances, as in Craighead, reasonably led Mr. Edwards to doubt Armstrong when he informed Edwards that his statements were voluntary and that he was free to leave. Id.

2.      Mr. Edwards's Freedom of Action Was Restrained

When law enforcement agents restrain the ability of a suspect to move about, he may reasonably feel that he is subject to police domination within his own home and thus not free to leave or terminate the interrogation. Id., citing Orozco, 394 U.S. at 325, 327. In Sprosty, for example, officers used their police cars to block the suspect's driveway to prevent his departure, and their standing so as to block his exit path from him home were factors that

contributed to a custodial environment. Sprosty, 79 F.3d at 642-43. Craighead was escorted to a back storage room and the door was closed behind him. The officer who did not interrogate him wore a flack jacket, was armed, and positioned himself in front of the door. Craighead, 539 F.3d at 1086. The Court found these circumstances reasonably led Craighead to believe he was under guard. His freedom of action was restrained in a way that increased the likelihood that he would succumb to police pressure to incriminate himself. Id., citing Miranda, 384 U.S. at 467.

Mr. Edwards was restrained in a manner similar to Sprosty and Craighead. As in Sprosty, there were a number of marked law enforcement vehicles lined up outside of his house, with a uniformed officer and one large SUV intentionally parked so that it would be visible from inside the home. While the vehicles may not have literally blocked Mr. Edwards' exit, their presence conveyed a clear message meant to deter him from leaving his own property. As in Craighead, Mr. Edwards' confinement in a bathroom with the door "cracked open" and two uniformed, armed officers standing guard, would not convey that he was free to leave regardless of Armstrong's statements to the contrary.

Armstrong completely controlled Mr. Edwards' environment, a point that is underscored by the fact that when Mr. Edwards indicated to Agent McCarthy that he wanted to speak to Armstrong, rather than allowing Mr. Edwards to leave the bathroom, McCarthy called Armstrong to come back in to speak to Mr. Edwards there. These facts also support the determination, discussed below, that Mr. Edwards was intentionally isolated from others.

### 3.    Mr. Edwards Was Isolated From Others

The Craighead Court referred to this factor a crucial in determining whether a suspect would feel compelled to provide self-incriminating statements. Id. at 1086-87, citing Miranda, 384 U.S. at 445–46, 449–50 (raising the concern that interrogations conducted in private are difficult to monitor for abusive techniques and have been associated with past practices of unlawful interrogation) and United States v. Griffin, 922 F.2d 1343, 1352 (8th Cir. 1990) ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements). Mr. Edwards was not offered the opportunity to call a friend or family member to be present with him during questioning. He was intentionally separated from his roommate ("from sight and sound") during the search and while Mr. Edwards was interrogated. Mr. Edwards, in the bathroom, could not even see what was going on outside the partially cracked open door. He was demonstrably isolated within the meaning of Miranda.

### 4.    The Coercive Context in Which Mr. Edwards Was Informed He Was Free to Leave or Terminate the Interview

An officer's mere recitation of the statement that the suspect is free to leave or terminate an interview does not render an interrogation non-custodial per se. These statements must be evaluated in the context of the scene as a whole. Craighead, 539 F.3d at 1088. Further, when the suspect's home is in fact the locus of police activity, as it was in Craighead and it was here, the officer's statements will have less resonance with the suspect. Id.  The presence of fifteen officers searching his home, one standing ready at his police Tahoe parked in front

of the house and two guarding Mr. Edwards in the bathroom, led him to reasonably believe he was not free to leave, notwithstanding that Armstrong told him he was.

> ### 5.   Armstrong Engaged in a False Pretense Designed to Encourage Edwards to Make Incriminating Statements

The Craighead Court was clear that the four factors it identified were not exhaustive. Id. at 1084. Armstrong told Edwards he was conducting an investigation into a child molestation case, even though the search warrant said nothing about that subject. Deceitful behavior by law enforcement officers is relevant to assessing the voluntariness of a defendant's confession. See Frazier v. Cupp, 394 U.S. 731, 739 (1969). Although voluntariness is an issue separate from compliance with Miranda, here there is a connection between the false pretense and Edwards' compulsion to answer questions. Edwards was clearly distressed that he might be accused of molesting a child and he was eager to assert his innocence to that charge. When Edwards asked why the search was taking place, Armstrong inferred that Edwards was the suspected child molester, saying "[y]ou know we didn't just drive through the neighborhood and pick out your house today." (Ex. 1, p. 8, lines 300-301.) Armstrong similarly left open the possibility that he was suspected of molesting a child, when Edwards asked whether the police were there "for – my roommate or for me?" Armstrong responded, "Well I'm hoping you can tell me that." Edwards answered, "I didn't do anything." (Ex. 1, p. 9, line 336-339.) Edwards then proceeded to answer a series of questions about his roommate, Losado and Losado's girlfriend. The first questions about internet use within the home concerned both Losado and Edwards. (Ex. 1, p. 14, lines 547-553.) Gamble casually asked Edwards to identify which computer he uses, and to provide the username and password he uses to access the internet.

(Ex. 1, p. 14-15, lines 547-608, 617-627.) Edwards was clearly under the impression that his answers were relevant to a child molest investigation that didn't involve him, with no clue that the search warrant being executed right outside the bathroom door authorized agents to seize his devices they believed contained child pornography. The seamless transition from the pretextual child molestation investigation to eliciting incriminating statements about child pornography was accomplished by design. It was a coercive tactic that contributed to the police-dominated atmosphere in Edwards's home interrogation.

B.   *Having Been Subject to Custodial Interrogation, Miranda Warnings Were Required but Not Given; Therefore, Mr. Edwards's Statements Must be Suppressed*

Considering the totality of the circumstances as analyzed under the five factors discussed above, it is clear that Mr. Edwards was subjected to custodial interrogation.[3] His home became a police-dominated atmosphere; therefore, Miranda warnings were required but not given and Edwards's self-incriminating statements must be suppressed. Miranda, 384 U.S. at 344; Gomez, 725 F.3d at 1125-26; New York v. Harris, 495 U.S. at 20.

The circumstances discussed above also support suppressing Edwards' subsequently made incriminating statements, even though Miranda warnings were read and purportedly waived.

---

[3] *See also, United States v. McKany*, 649 Fed.Appx. 553 (9th Cir. 2016) (Mem.), cited pursuant to Fed. R. App. P. 32.1 and 9th Cir. Rule 36-3. The Court reversed the district court's denial of McKany's motion to suppress, finding *Miranda* warnings were required, where fourteen officers were involved in executing the search warrant at the defendant's home, he was handcuffed, isolated from his father, and the officers closed the door of the bedroom where McKany was interviewed.

C.    *Statements Made in the Second Interview Must Be Suppressed as Involuntary*

When a defendant, like Edwards, provides unwarned incriminating statements in an initial interrogation, the admissibility of a subsequent, warned statement turns on whether it was knowingly and voluntarily made. Oregon v. Elstad, 470 U.S. 298 (1985).  Exclusion of involuntary statements deters the use of coercive police tactics and techniques against the accused. Id. at 321. The government bears the burden of proving that a statement is voluntary by a preponderance of the evidence. Connelly, 479 U.S. at 168 (internal citations omitted).

In order to be voluntary, a confession must be "the product of a rational intellect and a free will." Blackburn v. Alabama, 361 U.S. 199, 208 (1960). The voluntariness inquiry considers "all the circumstances of the interrogation." Mincey v. Arizona, 437 U.S. 385, 401 (1978).  Relevant circumstances may include: a suspect's age, education, intelligence, physical health, and prior experience with the criminal system; the length, location, and conditions of detention; the length and nature of questioning; and the use by law enforcement of any threats, punishments, or inducements. Bradford v. Davis, 923 F.3d 599, 616 (9th Cir. 2019). Also applicable here is the principle that a prior coerced confession can "taint" a subsequent one. Id., citing Elstad, 470 U.S. at 310. In conducting a taint analysis, the court considers "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." Id.

This Court should find the police-dominated atmosphere that attended Edwards' first interrogation tainted the voluntariness of his second interrogation, which occurred only 7 minutes later, in exactly the same circumstances.

14

**D.**     *Statements Made in the Second Interview Must Be Suppressed Because the Miranda Waiver is Invalid*

Alternatively, this Court must suppress the Edwards' statements made in his second interview because his purported waiver of Miranda is invalid. To admit an inculpatory statement made by a defendant during custodial interrogation, the defendant's "waiver of Miranda rights must be voluntary, knowing, and intelligent." United States v. Garibay, 143 F.3d 534, 536 (9th Cir. 1998) (internal quotation marks and citation omitted). A valid waiver of Miranda rights depends upon the "totality of the circumstances." Id. The prosecution bears the burden of proof, and there is a presumption against waiver. Id. at 536–37 (internal quotation marks and citation omitted).

Edwards acknowledges that a written waiver of one's Miranda rights is "strong proof" that the waiver is valid. North Carolina v. Butler, 441 U.S. 369, 373 (1979). However, the circumstances here weaken that presumption. As demonstrated above, there is robust evidence of coercive police activity, a predicate to finding a confession involuntary. United States v. Shi, 525 F.3d 709, 728 (9th Cir. 2008) (citations omitted). In addition to the coercive atmosphere, it took two agents 8 minutes to convince Edwards to sign the waiver form, a fact that cuts against voluntariness. Edwards asked questions that demonstrated his confusion about what rights he was actually waiving, which goes against the intelligence and knowing prongs. Finally, the fact that the agents did not obtain a verbal acknowledgment from Edwards that he wished to waive his rights, further supports the conclusion that he did not validly do so. Garibay, 143 F.3d at 536.

## III.   CONCLUSION

For all the reasons set forth herein, Mr. Edwards's statements were obtained in violation of law and must be suppressed. Miranda, 384 U.S. at 344; Gomez, 725 F.3d at 1125-26; New York v. Harris, 495 U.S. at 20.

Respectfully submitted this 10th day of June, 2019.

LAW OFFICES OF SEAN CHAPMAN, P.C.

BY:   /s/  Sean Chapman
Sean Chapman

### CERTIFICATE OF SERVICE

The undersigned certifies that on June 10, 2019, she caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification to the following:

Adam David Rossi
US Attorneys Office – Tucson, AZ
405 W. Congress, Suite 4800
Tucson, AZ 85701-4050
Adam.rossi2@usdoj.gov


Serena Lara