UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,   )
                            )
              Plaintiff,    )
                            )
vs.                         )   CR-19-00184-TUC-JGZ-LCK
                            )
Kyle Richard Edwards,       )
                            )   Tucson, Arizona
              Defendant.    )   October 3, 2019
_____)   1:38 p.m.


TRANSCRIPT OF PROCEEDINGS
MOTION HEARING
BEFORE THE HONORABLE LYNNETTE C. KIMMINS
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:
      Ms. Carmen F. Corbin
      Mr. Adam D. Rossi
      U.S. Attorney's Office
      405 West Congress Street, Suite 4800
      Tucson, AZ  85701

For the Defendant:
      Mr. Sean C. Chapman
      Law Office of Sean C. Chapman, PC
      100 North Stone Avenue, Suite 701
      Tucson, AZ  85701


Transcribed by:
      Aaron H. LaDuke
      405 W. Congress St., Suite 1500
      Tucson, Arizona  85701
      (520) 205-4264



Proceedings were digitally recorded
Transcript prepared by transcriptionist

                              I N D E X

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

WITNESSES FOR THE PLAINTIFF:

JEFFREY ARMSTRONG
BY MS. CORBIN.........5...............80
BY MR. CHAPMAN................55...............94

ROBERT McCARTHY
BY MS. CORBIN........110

WITNESS FOR THE DEFENDANT:

JUSTIN E. LOSADO
BY MR. CHAPMAN........97..............106
BY MR. ROSSI.................103

GOV. EXHIBIT:                                         ADMITTED:
10.............................................................15
8..............................................................16
13.............................................................25
11.............................................................28
12.............................................................29
14.............................................................30
1..............................................................35
2..............................................................35
3..............................................................35
7..............................................................46
15.............................................................54
9..............................................................88

DEF. EXHIBIT
2..............................................................35
3..............................................................35
1..............................................................46


                            *   *   *   *   *

P R O C E E D I N G S

(Call to order of court, 1:38 p.m.)

THE CLERK:  CR-19-184, United States versus Kyle Richard Edwards, on for a motion hearing.

Counsel, please state your appearances for the record.

MS. CORBIN:  Good afternoon, Your Honor.  Carmen Corbin and Adam Rossi for the United States.

THE COURT:  Good afternoon.

MR. CHAPMAN:  Good afternoon, Judge.  Sean Chapman, and Mr. Edwards is present with me.

THE COURT:  Thank you.

MR. CHAPMAN:  I'm here on his behalf.

THE COURT:  Good afternoon, Mr. Chapman and Mr. Edwards.

This is the time set for the evidentiary hearing on the defendant's motion to suppress.  Are the parties ready to proceed?

MS. CORBIN:  Yes, Your Honor.

MR. CHAPMAN:  Yes, but I would like to invoke the rule.

THE COURT:  Okay.  Ms. Corbin, are there -- who is going to be your first witness?

MS. CORBIN:  Special Agent Jeff Armstrong.

THE COURT:  Okay.  And is Agent McCarthy and Agent Griffin also here?

MS. CORBIN:  Agent Griffin is here, but he's the case agent.

THE COURT:  Okay.

MS. CORBIN:  So I would ask that he remain.  And Agent McCarthy is sitting outside.

THE COURT:  All right.  So I think we're okay there.

All right.  And I'm assuming, Ms. Corbin, you're going to proceed first.

MS. CORBIN:  Yes.

THE COURT:  Okay.  Go ahead.

MS. CORBIN:  Thank you.

And, Your Honor, we have the computer set up to play some audio.  It seems to be having a little bit of hiccups, so we'll figure it out as we go along.

THE COURT:  Okay.

MS. CORBIN:  Yes.  I'm sorry.  Government calls Special Agent Jeffrey Armstrong.

THE COURT:  Okay.  Agent Armstrong, if you would please come forward.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you're about to give in this matter now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE CLERK:  Thank you, sir.  You may be seated.  And

as you are, please speak directly into the microphone and state your name for the record.  Please spell your last name.

THE WITNESS:  Jeffrey Armstrong, J-E-F-F-R-E-Y, A-R-M-S-T-R-O-N-G.

MS. CORBIN:  May I proceed, Your Honor?

THE COURT:  Yes, go ahead.

MS. CORBIN:  Thank you.

JEFFREY ARMSTRONG, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. CORBIN:

Q    Special Agent Armstrong, could you please tell us where you work.

A    The Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations.

Q    And how long have you worked for that agency?

A    Approximately nine years.

Q    And what have you done during your time of being there for nine years?

A    I've investigated drug smuggling, alien smuggling, financial crimes.  I taught at the academy for eight months and, for a brief period, child exploitation investigations.

Q    Okay.  And for a brief period, how long did you work on child exploitation cases?

A    I would say approximately eight to 11 months.

Q    Okay.  And are you in a specialized group that works

specifically -- when you say you worked on those cases, were you in a specialized unit?

A    Yes, for a brief time.

Q    Okay.  And do you recall where specifically you were assigned and which group in 2016?

A    I don't recall the exact dates, but for a portion of that I was assigned to the Child Exploitation Group.

Q    Okay.  And before you were assigned to the Child Exploitation Group, what group were you working on before?

A    It was called the Silverbell Initiative.  It was more of a drug and alien smuggling group.

Q    Okay.  Did you work with like rip crews, drugs, smuggling, that sort of thing?

A    That is correct.

Q    Okay.  And in your responsibilities when you did work for the child exploitation section, what were you working on? What were some of your duties?

A    To investigate illegal exploitation of children.

Q    Okay.  And did that involve child pornography?

A    Yes, it did.

Q    And what did it involve specifically with child pornography?  What was the crime that you were typically investigating?

A    Either possession cases, distribution cases, sometimes sex trafficker cases.

Armstrong – Direct

Q    Okay.  Are you familiar with the investigation of the defendant, Kyle Edwards?

A    Yes, I am.

Q    And how are you familiar with it?

A    I'm the original case agent.

Q    Okay.  And so can you tell me just from the beginning how the case initiated, just generally how the case initiated and came to you.

A    I was informed that the group employs law enforcement software correlated with the BitTorrent network.

Q    All right.  And so the software that law enforcement used, do you know generally what it did?

A    It would look for IP addresses that were distributing child pornography.

Q    Okay.  And so in this case in particular, do you -- what did you learn that ultimately led you to start investigating in this case?

A    That the law enforcement tool connected with an IP address and a subsequent download of child pornography ensued.

Q    Okay.  And what was the IP address in this case, not specifically the numbers, but how did it ultimately relate to the defendant?

A    A legal process was served on the IP provider, CenturyLink, and the subscriber was Mr. Edwards.

Q    Okay.  And did that point you to a specific location?

8

Armstrong – Direct

A       Yes, it did.

Q       What was the location?

A       7230 West Kiwi Lane.

Q       And what was that location, to your understanding?

A       A residence.

Q       The residence of whom?

A       Of Kyle Edwards.

Q       Okay.  And how did it relate to the IP address that you had found, the law enforcement software had found distributing child pornography over?

A       I don't understand.

Q       How did that address relate to the IP address that you had discovered sharing child pornography?

A       When the summons came back from CenturyLink, it not only identified Mr. Edwards by name but also that same address.

Q       Okay.  And you said that the software program had downloaded child pornography files.  Did you view those files?

A       Yes, I did.

Q       And how many in total did you see?  Do you recall?

A       Approximately 15 that were child pornography-related.

Q       Were more files downloaded, more than 15?

A       Either whole or partial, yes.

Q       Okay.  But 15, you say, you viewed and determined that they qualified as, from what your understanding was, child pornography?

A    That is correct.

Q    Do you recall what -- I don't need to know details but what they generally depicted, these pictures that you saw?

A    Prepubescent females, ranging in ages from approximately two to six, being touched by what appeared to be adult male anatomy.

Q    Okay.  Involved in sexual conduct?

A    That is correct.

Q    Okay.  And so after you received the information back regarding the IP address and the residence address, what did you do?

A    I performed a wireless survey in front of the residence from the street.

Q    Okay.  And what did you see?  Were there -- was there Internet?

A    There was Internet.  However, all the access points were locked.

Q    Okay.  And what does that mean that they were locked?

A    That someone would need a password to access those specific, those specific -- not units.  I'm at a loss for words here.

Q    The modems?  The wireless --

A    Correct.  Thank you.

Q    Okay.  All right.  So after you did that, what did you do next in your investigation?

A    I drafted an affidavit for a search warrant.

Q    Okay.  And did you ultimately apply for a search warrant?

A    Yes, I did.

Q    And did you get a search warrant?

A    Yes, I did.

Q    And was it at this court that you received --

A    Yes, it was.

Q    Okay.  And did you execute that search warrant?

A    Yes, we did.

Q    Do you recall what date you executed it?

A    May 31st, 2016.

Q    Okay.  All right.  So on the date of May 31st -- and let me step back.  Who is the main case agent at this time in this investigation?

A    I am.

Q    You are.  And so when you're going to execute a search warrant, who is directing the activities and all of the elements of that execution of that search warrant?

A    Usually the group supervisor for that group.

Q    Okay.  Would you have also been involved in determining who was there and what people did?

A    Yes.

Q    So what happened the morning of May 31st, 2016?

A    The warrant was not valid until 6 a.m., so therefore I requested everybody to stage behind the Walgreens at Twin

Peaks and Coachline.

Q    Okay.  So you said the warrant wasn't valid before 6 p.m. -- or 6 a.m.  What does that mean to you or what did that mean?

A    Unless an exception is granted by a judge, federal warrants are only allowed to proceed between 6 a.m. and 10 p.m.

Q    Okay.  All right.  And so you scheduled the meet-up at, you said, 5:30?

A    Correct.

Q    Is that a typical procedure that you would do in executing your search warrants?

A    Yes, it is.

Q    Why is that?

A    It's -- it gives the agents a refresher on the mission at hand of what -- to make sure, first of all, everyone shows up on time who is participating in the execution of the search warrant.  Oftentimes people -- or not oftentimes.  Sometimes people have family matters they need to attend to, they're sick themselves, their kids are sick, so sometimes people have to drop out, so therefore to make sure we have enough agents to safely perform and execute the search warrant.

Q    Okay.  And so then what happened after you had this meet-up?  What happened next?

A    I had previously requested for a marked Marana Police

Department officer to assist on the approach.

Q    And why is that?

A    Oftentimes agents are dressed in jeans or cargo pants, commonly referred to as 511s.  We do have vests on that clearly identify ourselves as police officers.  But in my law enforcement history, I wanted the occupants of the residence to know that it wasn't a rip crew at their door, that it was actually the legitimate police, so therefore I instruct -- or I request to have a uniformed local police officer to not only pull up and activate their overhead emergency lights, but in this instance I also had the officer go to the door with me so that if the occupants looked out through the window they would see the marked Marana cruiser and, if you will, be put at ease that it's the legitimate police knocking on their door.

Q    Okay.  And at what time did you ultimately go and approach the house?  Do you recall about what time?

A    It was probably a minute or two before 6:00 before I knocked.

Q    Okay.  And who did you approach the house with?

A    Officer Southerland from the Marana Police Department.

Q    Okay.  And again because he was in uniform?

A    That is correct.

Q    What were you wearing at that time?

A    I know I had my bulletproof vest on with my police markings.  I don't recall if I was wearing jeans or if I was

wearing cargo pants.

Q    And why are you wearing your bulletproof vest with police marked on it?

A    The execution of a search warrant for any law enforcement officer is a potentially very dangerous and/or fatal encounter that could ensue.

Q    Okay.  And why execute the search so early, 6 a.m., at the moment that basically the warrant becomes valid?  Why execute it so early?  Is there a reason?

A    Yes.  First of all, we want to encounter the occupants of the residence home, not at school, not at work.  Second of all, at that time of the morning, many people are getting around or getting their kids around, if they have them, for school.  Hopefully they haven't -- they're not under the influence of controlled substances or alcohol that early in the morning.  And for us additionally it's a safety factor where hopefully they will not arm themselves as opposed to doing a later-in-the-evening execution of a search warrant.

Q    And when you went to the house that morning, did you know who you were looking for?  Did you know who your suspect was at that time?

A    Only from the IP address subscriber information.

Q    So did you know a specific person that you were looking for?

A    The subscriber was Mr. Edwards.

Q    Did you know if he lived alone?

A    No.  I had seen another vehicle parked out on the street, a blue Toyota I believe, and when I ran the plate, it came back to a Justin and I believe Albert Losado but at a different address.

Q    Okay.  So potentially there was another occupant?

A    Correct.

Q    At the time that you went to the house, did you know who had been in the house potentially sharing child pornography?

A    No.

Q    Okay.  All right.  I would like to show you what's been marked as Government's Exhibit 10 and 8.

Your Honor, may I approach?

THE COURT:  Yes.

MS. CORBIN:  Actually, I think -- I think I can do it up here.

THE COURT:  Does it take a minute to light up, Cindy?

THE CLERK:  Uh-huh.

THE COURT:  Okay.

MS. CORBIN:  Okay.

THE COURT:  There it goes.

MS. CORBIN:  If I have to do it upside down, it's okay.  I'll figure it out.  There it goes.

BY MS. CORBIN:

Q    Okay.  I'm showing you what's been marked as Government's

Exhibit 10.  Do you recognize that?

A    Yes, I do.

Q    And how do you recognize it?

A    That's the front door of the residence where we executed the search warrant.

Q    Okay.  On the day of May 31st, 2016?

A    That is correct.

Q    And does this photo depict how that house looked that day when you were there?

A    That is correct.

        MS. CORBIN:  Your Honor, I would ask that Government's Exhibit 10 be admitted.

        MR. CHAPMAN:  No objection.

        THE COURT:  10 will be admitted.

BY MS. CORBIN:

Q    Okay.  And so looking at this exhibit and this photo, is this the front door that you approached --

A    That is correct.

Q    -- when you did your initial approach?

A    Yes.

Q    And again, who was with you when you did the initial approach?

A    Officer Southerland from the Marana Police Department.

Q    And it was just the two of you?

A    At the door, yes.

Q    At the door.  Okay.  And then let me show you -- okay. Now I'm going to show you what's been marked as Government's Exhibit 8.  There it goes.  Do you recognize that?

A    Yes, I do.

Q    And how do you recognize that?

A    That's the sketch that Special Agent Mike Green drew of the layout of the residence.

Q    Okay.  And does it accurately depict what the residence looked like, in your memory, on that day?

A    The layout, but it is not to scale.

     MS. CORBIN:  Okay.  Your Honor, I would ask that Government's Exhibit 8 be admitted.

     MR. CHAPMAN:  No objection.

     THE COURT:  8 will be admitted as well.

     MS. CORBIN:  Thank you.

BY MS. CORBIN:

Q    So looking at this photo -- or, I'm sorry, this sketch of the residence, the front door is -- where's my -- oh -- is here?

A    Correct.

Q    Is that right?

A    Correct.

Q    That's the picture that we just saw?

A    Correct.

Q    Okay.  Okay.  And so on that day, how many agents were

there with you to execute the search warrant?

A    There was 18 of us.

Q    And 18.  Do you recall just generally who all of those people were?  Maybe not by name.  That's a lot of people, but do you generally recall who was there?

A    Yes.

Q    Can you tell me?

A    By name or --

Q    Not by name.  Just who were some of the people that you had asked to come and help with the warrant?

A    Other members of my group.

Q    Okay.

A    ICE has a HERO program, the acronym, where we hire wounded veterans and train them on computer forensics, and so we brought them along as well on this search warrant.  I don't recall if my supervisor asked other supervisors if they could loan agents to assist us on that day.

Q    Okay.  And was that a typical amount of agents to have on this type of search warrant?

A    Yes, it can be.

Q    Why?

A    Because these type of investigations are very digital-intensive, and since flash drives and SD cards can be very small and can be hidden in numerous places within a residence, we tried to bring as many agents to search as

possible so that we can do not only a thorough search but that we're not at the residence all day long.

Q   Okay.  And so typically what were most -- what were the duties that these different agents would have been doing throughout the entire time that you were there?  What were different jobs that people would have had?

A   One, as you can see, was to sketch.  Another duty is to take photographs of the scene.  Other duties are to search. Other duties are to catalog and record where items of evidentiary value were located, also interview.

Q   Okay.  All right.  I'm going to take you back to 10.  So when you arrive -- and you said you approached with I believe you said Police Officer Southerland --

A   Correct.

Q   -- from Marana?

A   Correct.

Q   What happened?

A   I checked my watch to make sure it read 6:00 o'clock so that the warrant would be valid, and then I proceeded to ring the doorbell.

Q   Okay.  So walk us through what happened with your approaching the door and ringing the doorbell.

A   As I rang the doorbell, I could hear the doorbell ring from within.  After a few seconds of not hearing a response, I rang the doorbell again, again waited a few more moments, and

then subsequently I heard what I thought was to be the locking mechanism being disengaged from the front door.

Q    Okay.  And so who ultimately answered the door?

A    Mr. Edwards.

Q    And do you -- you saw Mr. Edwards.  Did you speak with him that morning?

A    Yes, I did.

Q    Do you see him in the courtroom today?

A    Yes, I do.

Q    Can you tell me what he's wearing?

A    He's wearing a light-colored, button-down, short-sleeve shirt.

Q    Okay.  And what table is -- who is he sitting next to?

        MR. CHAPMAN:  We'll stipulate to his identity, Judge.

        MS. CORBIN:  Okay.

        THE COURT:  The record will reflect --

        MS. CORBIN:  Thank you.

        THE COURT:  -- that the agent has identified Mr. Edwards.

BY MS. CORBIN:

Q    All right.  And so once Mr. Edwards answered the door, what happened?  Did you speak with him?

A    Briefly, yes.

Q    What did you tell him?

A    I identified ourselves as the police and advised him that

we had a search warrant for the residence.

Q    Okay.  And what did he say?

A    Well, I asked him to step out and I asked him if there were any other occupants, children, dogs, or weapons in the residence.

Q    Okay.  Did you tell him -- at that moment, did you tell him any more about why you were there other than just to execute the search warrant?

A    No.

Q    Okay.  Was your gun visible at that time?

A    No.

Q    Okay.

A    Well, I'm -- visible in the holster.

Q    Okay.  So where do you usually wear your holster?

A    Either on my right hip or either what's called a dropdown holster on the right thigh.  I don't recall which one I was wearing that day.

Q    Okay.  And so after you asked him to step outside, what happened?

A    I, I -- he advised me that his roommate was inside, so I began calling inside, identifying ourselves as the police and calling, requesting that the roommate exit the residence as well.

Q    Did you ask him about any guns in the house?

A    Yes, I did.

Q     And what did he tell you?

A     Initially he said there were none.

Q     Okay.  He initially said and then did that change later?

A     Yes, it did.

Q     Okay.  Can you tell me a little bit about that?

A     After not getting a verbal response nor seeing the roommate that Mr. Edwards said was inside, I then escorted Mr. Edwards away from the front door.

Q     Why did you do that?

A     For his safety and for mine.

Q     Uh-huh.

A     I had loudly yelled into the residence that the police were there to execute a search warrant, and Mr. Edwards told me there was another occupant in there, and now this occupant is not responding to my commands, my verbal commands, so I'm fearful that maybe this occupant or occupants are arming themselves against the police.

Q     Okay.  So you escort him where, did you say?

A     I escorted him down the sidewalk, as you can see there in Exhibit 10, towards the driveway.

Q     Okay.

A     And that's where the entry team was stacked up to make entry.

Q     Okay.

A     And I called for them.  After not getting a response from

inside, I called for the entry team to come up.  And while escorting Mr. Edwards to safety in the driveway, he then reminded me that his roommate was a disabled veteran and that his roommate had guns.

Q    Okay.

A    And I relayed that to the entry team as they were entering into the residence.

Q    And I'm sorry.  You said that he relayed that his roommate had several guns, multiple guns?

A    Yes, I believe he said that.

Q    Okay.  And so you relayed that information back to --

A    The entry team.

Q    And the entry team is -- explain to me what that is.

A    It's an assemblage of agents, and their job is to actually make entry into the residence and to what we'll call clear it, to search it for additional people.

Q    Okay.  Would they have had their guns drawn --

A    Yeah.

Q    -- during that?

A    Yes.

Q    Is that typical for every -- any search warrant that is executed?

A    Most search warrants, that is typical.

Q    Okay.  And why is that?

A    Officer safety.

Q    Okay.  So was the roommate, the other occupant, ultimately found?

A    Yes.

Q    And what happened?

A    The entry team detained him and put him into handcuffs.

Q    And did he remain in handcuffs for the rest of the time that you were there?

A    No.

Q    Tell me the timeline in which he was put into handcuffs.

A    During the --

Q    Why was he put into handcuffs?  Let me say that.

A    Well, initially we don't know how many occupants or subjects are in a residence until we thoroughly check it.  Unfortunately, we've had people lie to us about how many people are in a residence or weapons and where the weapons are at.  So for officer safety we detain and handcuff usually adults not only for their safety but for the other agents until the scene can be totally cleared and deemed safe.

Q    Okay.  And how long did that take that day to clear it?

A    Probably several minutes.

Q    Okay.  And was -- were the handcuffs removed from Losado after that?

A    Yes, they were.

Q    And what did Losado do after that, the roommate?

A    He was escorted to the back patio.

Q    Did you tell him anything?

A    I don't know if I spoke to him or if another agent did.

Q    Okay.  Was he told, though, that he was free to leave?

A    Yes.

Q    That he wasn't under arrest?

A    Correct.

Q    And was he told -- was he advised to sit on the patio, or was that a choice that he made?

A    No.  It was explained to him that since we had to search the entire residence, he was not only free to leave, but if he was going to stay, I didn't want him to interfere in the search.  I didn't want him to potentially destroy or hide any evidence that may be within the residence.  So the back patio was probably the most safe place for him and for his privacy from the neighbors.

Q    All right.  I'm going to show you what's been marked as Government's Exhibit 13.  Do you recognize this?

A    Yes, I do.

Q    And how do you recognize it?

A    It's a photograph taken from the front door area across the living room towards the sliding glass doors where the back patio is.

Q    Okay.  And does it accurately depict how the residence looked that day?

A    Yes, it does.

MS. CORBIN:  Your Honor, I would ask that Exhibit 13 be admitted.

MR. CHAPMAN:  No objection.

THE COURT:  13 will be admitted.

BY MS. CORBIN:

Q    So you were just saying that Losado, the roommate, was sitting on the back patio.  Is this the patio?

A    Correct.

Q    It's open-air, I mean, outdoor?

A    Correct.

Q    Okay.  When he was sitting back there, was anybody sitting with him?

A    Yes, there was.

Q    And why would somebody be sitting with him?

A    Again, for officer safety.  The agents inside are busy conducting searches under couches, under -- and their attention is not for a possible assault from an occupant, and so therefore we maintain officer safety by having another agent sit with him.

Q    Was he handcuffed while he was out there?

A    No.

Q    Okay.  And so where was Mr. Edwards at this time?

A    I invited him to his master bathroom so that I could speak with him.

Q    Okay.  So you have Losado and Edwards in two separate

locations in the residence?

A    That is correct.

Q    And why is that?

A    I wanted the subjects separated by sight and sound so therefore one could not influence or make statements to the other.

Q    Okay.  And as far as you're aware, Losado and Edwards aren't family members?

A    Correct.

Q    Okay.  So you said you asked Edwards if he would speak with you.  At the time were your weapons drawn when you asked him that question?

A    No.

Q    Did you tell him he had to speak with you?

A    No.

Q    Did you tell him he was free to leave?

A    Several times.

Q    Did you tell him that he was under arrest?

A    No.

Q    Did you tell him any things he decided to say to you were voluntary?

A    Yes.

Q    Okay.  When you spoke to the defendant, did he seem awake and coherent?

A    Yes.

Q    Did he seem confused?

A    No.

Q    Did he ask for medical assistance?

A    No.

Q    Did he seem under the influence of anything?

A    No.

Q    Did he seem to understand your words?

A    Yes.

Q    And did you understand his responses to you?

A    Yes, I did.

Q    Was he handcuffed at the time that you made the request to speak with him?

A    No.

Q    And did he agree to speak with you?

A    Yes.

Q    Okay.  All right.  I'm going to show you what's been marked as Government's Exhibit 11.  Do you recognize that?

A    Yes, I do.

Q    And how do you recognize it?

A    That's the entryway to Mr. Edwards' bedroom.

Q    Does it accurately depict what the residence looked like that day?

A    Yes, it does.

        MS. CORBIN:  Your Honor, I would ask that Exhibit 11 be admitted.

MR. CHAPMAN:  No objection.

THE COURT:  11 will be admitted.

BY MS. CORBIN:

Q    Okay.  Can you tell me again, where did you ultimately speak with the defendant when you did speak with him that day?

A    For privacy reasons, it was in the master bathroom, which is off to the right.  You can just see the doorjamb there on that exhibit.

Q    Okay.  So this is the master bedroom?

A    Correct.

Q    And there's a hallway that leads -- let me get the sketch.

THE COURT:  And for the record, Ms. Corbin was pointing towards the "G" that's in the picture.

BY MS. CORBIN:

Q    I'm going to show you again Exhibit 8.  I'm not sure. Maybe it's better to do it this way.  Exhibit 8, which is the sketch, and so the -- we just saw a picture of the master bedroom.  Is that this room right here?

A    That is correct.

Q    And the hallway that we saw in that picture, is that right here?

A    That is correct.

Q    Okay.  And you said you interviewed him where?

A    In the master bathroom, room J.

Q    All right.  And that's this room right here?

A    That is correct.

Q    And was the master bathroom a small bathroom?

A    It had a walk-in closet, a double sink, a toilet, and I don't -- and a bath/shower combo.

Q    All in the same room?  All in the same space?

A    Correct.

Q    Okay.  All right.  Let me now show you Government's Exhibit 12.  Do you recognize that?

A    Yes, I do.

Q    Can you tell me what it is.

A    It's Mr. Edwards' bedroom.

Q    Okay.  And does it accurately depict what it looked like that day?

A    Yes, it does.

        MS. CORBIN:  Your Honor, I would ask that Exhibit 12 be admitted.

        MR. CHAPMAN:  No objection.

        THE COURT:  12 will be admitted.

BY MS. CORBIN:

Q    So if I'm comparing 11 and 12, this is the bed area, but going back to Exhibit 11, it's down this hallway?

A    That is --

Q    So this is a separate room where you see this wall right here?

A      That is correct.

Q      And what room was that?  Is that the master bath?

A      Correct.

THE COURT:  And for the record, you're talking about where the Exhibit 11 ends there's an area that shows an entryway.

MS. CORBIN:  Okay.

BY MS. CORBIN:

Q      And finally I'll show you Government's Exhibit 14.  Do you recognize this?

A      Yes, I do.

Q      And what is it?

A      It's a photograph of Mr. Edwards' bathroom.

Q      Okay.  And is this the bathroom where you interviewed Mr. Edwards?

A      Yes.

Q      Does this photo accurately depict what it looked like that day?

A      Yes, it does.

MS. CORBIN:  Your Honor, I would ask that Government's Exhibit 14 be admitted.

MR. CHAPMAN:  No objection.

THE COURT:  14 will be admitted.

BY MS. CORBIN:

Q      Okay.  So looking at this picture, you said this is where

the defendant was interviewed.  Can you tell me where you were seated or standing or how everybody was placed in the room.

A    I sat on the countertop.  I asked Mr. Edwards to sit on the tub.

Q    Can you tell me where the tub is.

A    It's not shown in this photo, but it would have been off to the left.

Q    So is this a door here?

A    Yes.

Q    And is it behind that area?

A    Yes.

Q    Okay.  So Mr. Edwards is over here on the tub?

A    Yes.

Q    You're here?

A    Correct.

Q    Or somewhere around here.  And who else is in the room?

A    Initially it was Agent Katherine Gamble.

Q    Okay.  And where was she?

A    I think she was standing out next to that partition, but I'm not --

Q    And is this the partition right here?

A    Correct.

Q    What is over here?

A    A toilet.

        THE COURT:  And, Ms. Corbin, I'm going to ask you to

describe what you're doing.

MS. CORBIN:  Okay.

THE COURT:  You're doing a lot of "over here," "over there."

MS. CORBIN:  Yeah.

THE COURT:  And the record is not going to show what you're talking about.

MS. CORBIN:  I will.  Thank you, Judge.

THE COURT:  Sure.

BY MS. CORBIN:

Q    So what -- the partition is here, this outcropping of a brownish structure, and it looks like a towel rack is on the far right of the photo above the exhibit sticker; is that right?

A    Yes.

Q    And what was in that area?

A    A toilet.

Q    And then behind this outcropping over where the mirror is, what is this opening right here?

A    A walk-in closet.

Q    A walk-in closet.  So the entire interview that you had with Mr. Edwards, do you recall in total how long you spoke with him?

A    I would say probably approximately 45 minutes, total.

Q    Okay.  And was it in this one location the entire time?

A     Yes.

Q     And was he cuffed at any time, handcuffed any time during the interview?

A     No.

Q     Okay.  I'm going to show you --

        THE COURT:  And actually before you do that, Agent Armstrong, where is the second agent at in relation to Exhibit 14?

        THE WITNESS:  I believe both Agent Gamble and Agent McCarthy were standing next to the partition area that separates the toilet alcove from the space to access the walk-in closet.

        THE COURT:  Okay.

BY MS. CORBIN:

Q     Oh, the walk-in closet.  I'm sorry.  Here?

A     Yeah.  I think they were standing around where that partition ends.

Q     Like on this side?

A     Yeah.  I -- around where that partition ends, possibly. I don't recall exactly where they were standing.

        THE COURT:  Thank you.

BY MS. CORBIN:

Q     And the Judge asked you about the agents and you said Agent McCarthy and Agent Gamble.  Were they both in the room at the same time when you were in there?

A     No.

Q     Were they separately -- how many agents in total were in the room when the defendant was being interviewed, the entire interview?

        MR. CHAPMAN:  Can I have clarification on that last question?

BY MS. CORBIN:

Q     How -- how many agents interviewed the defendant throughout his interview?

A     Two at a time.

Q     Two at a time.  Thank you.

      Okay.  I would like to show you what's been marked as Government's Exhibit 1.

      And, Your Honor, Exhibits 2 and 3 are transcripts from Exhibit 1, and I believe they're also listed -- or do you have the transcripts listed on yours?

        MR. CHAPMAN:  Yeah.

        MS. CORBIN:  Okay.  They're also on the defense exhibit list, so I believe we would be in agreement to them coming in.

        MR. CHAPMAN:  Which ones are you --

        MS. CORBIN:  It's the transcripts from this.

        MR. CHAPMAN:  Those two?

        MS. CORBIN:  Yeah.

        MR. CHAPMAN:  Yeah, no objection.

THE COURT:  Okay.  So that would be Government's --

MS. CORBIN:  Government's --

THE COURT:  -- Exhibits 1, 2, and 3.

MS. CORBIN:  Yes.

THE COURT:  And Defense Exhibits 2 and 3, correct?

MR. CHAPMAN:  Yeah, that's correct.

THE COURT:  Okay.  The Court will show all of those are admitted.

MS. CORBIN:  Thank you, Your Honor.

BY MS. CORBIN:

Q    Okay.  When you -- you said you escorted the defendant, I believe, to come and speak with you and you escorted him to this location, the bathroom location?

A    Yes.

Q    And again, can you tell me why you took him specifically there?

A    Since the nature of the interview was sensitive, I wanted a place that was as private as possible, and also since the other agents were searching the house, which would have -- to include his bedroom, I was looking for the most private area possible.

Q    Okay.  Did you tell him that he was not under arrest?

A    Yes.

Q    And that he was free to leave?

A    Yes.

Q    Did you say this numerous times throughout your interview?

A    Yes.

Q    Okay.  And when you started the interview, what were the initial questions that you asked him?

A    Background biographical questions.

Q    And what do those include, generally speaking?

A    Name, date of birth, Social Security number, addresses, phone numbers, emails, education levels, languages that are either written and/or spoken.

        MS. CORBIN:  Okay.  All right.  Your Honor, I think that the only other exhibits I'll have will be played from the audio, and so I need to be able to -- we were having trouble playing the -- having the ELMO on.

        UNIDENTIFIED FEMALE VOICE:  Standby.  It's on -- it's the standby one.  {Indiscernible.}

BY MS. CORBIN:

Q    Okay.  I would like to play for you just the beginning of Exhibit 1.  And did you get a chance to review what was on Exhibit 1 before we came to court?

A    Yes, I did.

Q    And how many interviews, recordings I guess, are on that DVD, CD?

A    Two.

Q    All right.  I'm going to play for you just the beginning

of the first interview, if it will play.

(An audio recording was played.)

MS. CORBIN:  Okay.  I'm going to pause it there because there's a lot of personal information right there at the beginning.

I apologize for it doing that.

THE COURT:  That's okay.

MS. CORBIN:  I'm not sure why.  Maybe I can mute that.

BY MS. CORBIN:

Q    Okay.  Eventually did you start asking him about your investigation?

A    Yes, I did.

Q    What did you originally tell him the reason was that you were there?

A    We were investigating a child molestation complaint.

Q    A child molestation complaint?

A    Yes.

Q    And why did you tell him that?

A    Because some of the images from the download appeared to be subjects who were molesting kids.

Q    Okay.  And again, at the time that you went into the residence, did you know specifically where your investigation that day was going to lead?

A    No, I did not.

Q    All right.  Did you -- during your initial part of your conversation, did you offer him water?

A    Agent Gamble did.

MS. CORBIN:  Okay.  I'm going to try to skip ahead to minute 6.

Your Honor, I'm just going to play snippets.  The whole interview is in evidence for your review, but just to give you an idea of what the interview was like and more discussion points for today.

(An audio recording was played.)

BY MS. CORBIN:

Q    Let me stop just briefly right there.  Do you recognize that voice?

A    Yes, I do.

Q    Who is that?

A    One of them is me.

Q    Okay.  And do you recognize the person who responded?

A    Yes.

Q    And who was that?

A    Mr. Edwards.

(An audio recording was played.)

BY MS. CORBIN:

Q    The female voice on there, who is that?

A    Special Agent Katherine Gamble.

MS. CORBIN:  Okay.

(An audio recording was played.)

BY MS. CORBIN:

Q    And that voice that we just heard, what was -- who was that?

A    I don't recall whose voice exactly that was.

Q    Was it another agent?

A    Yes.

Q    And could you hear activity that was happening outside of the room you were in?

A    Yes.

Q    Why was that?

A    Because an active search was being conducted throughout the entire residence.

Q    Okay.  And was -- were you able to see what was happening out -- was the door open or was the door closed?

A    It was cracked open.

Q    Okay.  And we saw in the sketch that there's the doorway from the -- into the bedroom and then there's the bathroom door.  Do you recall if all of those doors were cracked?

A    I don't remember if they were at different stages of closed or cracked throughout the day.  I don't remember.

Q    But you recall that the bathroom door was --

A    Correct.

Q    -- at least cracked?

A    Yes.

(An audio recording was played.)

BY MS. CORBIN:

Q    Okay.  So you listened to that.  Did you hear yourself make reference to the door?

A    Yes.

Q    And what did you say about the door?

A    That the door was open.

Q    Okay.  You asked after that -- or did the interview continue with the defendant at that time?

A    Yes.

Q    And at some point did he ask Special Agent Gamble to leave?

A    Yes.

Q    Okay.  And do you recall why, why he asked, why he wanted her to leave?

A    I don't know exactly what he said with regards to -- I just remember him saying, can she leave, inferring if Agent Gamble could leave.

        MS. CORBIN:  Okay.

    (An audio recording was played.)

BY MS. CORBIN:

Q    What is happening during this period?

A    Another agent is asking for a room label to affix to the wall for ease of recording.

        MS. CORBIN:  Okay.

(An audio recording was played.)

BY MS. CORBIN:

Q    Okay.  So you just listened to that.  Does that --

A    Yes.

Q    -- help you remember exactly what happened when Special Agent Gamble left?

A    Yes.

Q    What happened exactly?

A    He talked about his masturbation habit.

Q    Okay.  And so potentially he didn't want a female in the room?

A    Correct.

Q    And so who ultimately entered the room as the other agent?

A    Special Agent Bob McCarthy.

Q    Okay.  And then for the rest of the time that you spoke to Mr. Edwards that day, was Special Agent McCarthy with you the rest of the time?

A    Yes, he was.

Q    And again, during that exchange we can hear a lot of activity and other things.  Again, is this because the door is open?  Are people coming in and out and talking to you?

A    I believe the door is ajar.  I don't recall how ajar it was, but I believe it was agents who were searching the master bedroom --

Q    Okay.

A    -- which was adjacent, obviously, to the master bathroom.

Q    Okay.  So what happened after Special Agent McCarthy comes in?  How does the conversation proceed after that?

A    We asked Mr. Edwards about his -- the search terms that he uses with regards to his pornography and masturbation habit.

Q    Okay.  Did you ask him about whether he used file-sharing software?

A    Yes.

Q    And what did he say?

A    He said he had used BitTorrent and the peer-to-peer.

Q    Okay.  And was that relevant to your investigation, the fact that he said he had used BitTorrent?

A    Yes, it was.

Q    Why was that?

A    Because the law enforcement automated tool that we used to initiate this investigation was BitTorrent-related.

Q    Meaning files were sharing over BitTorrent?

A    Correct.

Q    Okay.  Did he indicate that he had just done something recently to his computer?

A    That he had reset it.

Q    And why?

A    He said he was having issues with it.

Q     Okay.  Did you ask him about ever seeing child pornography?

A     Yes.

Q     And what did he say about that?

A     He saw it approximately one year ago.

Q     Okay.  And did you ask him or did the two of you ask him if child pornography or search terms related to child pornography would be found on his computers?

A     Yes.

Q     And what did he -- what happened after you asked that?

A     Could you rephrase, please.

Q     What did the defendant say or what happened after you asked that question?

A     I believe he said it popped up one time.

Q     Okay.  Did at any point the defendant want to stop the interview?

A     Yes.

Q     Okay.  I'm going to play for you -- this is going to be the longest section I'll play, Your Honor.

        THE COURT:  That's fine.

        MS. CORBIN:  But I think it's important.

    I'm going to play for you the tail end of the interview for us to listen to.

    (An audio recording was played.)

BY MS. CORBIN:

Q    Okay.  Do you recall all of that exchange?

A    Yes, I do.

Q    All right.  And so what happened after, after that?  What did you do?

A    I left the room to see how the progression of the search warrant of the residence was going.

Q    Okay.  And what happened from there?

A    Agent McCarthy remained with Mr. Edwards.

Q    And then -- oh, I'm sorry.  Hold on one second.  I wanted to get that queued up.  And what happened -- at least from what you were doing, what did you do next?

A    I subsequently was recalled to the bathroom and advised that Mr. Edwards wanted to speak to me again.

Q    Do you remember how you were informed that Mr. Edwards wanted to speak with you again?

A    I do not recall.

Q    And let me step one second back.  That first part of the interview, we only heard snippets of it.  Do you recall how long that first part of this interview that we just listened to, not in totality, how long it lasted?

A    I think approximately 30 minutes.

Q    Okay.  You don't recall how you got called back in?

A    No, I don't remember who called me back in.

Q    Did you go back in?

A    Yes, I did.

Q    Okay.  And again, when you went back in, who was in the bathroom at that time?

A    Agent McCarthy and Mr. Edwards.

Q    Just the two of them?

A    Yes.

Q    Were they seated in the same place that you had left them?

A    Yes.

Q    How much time had passed since you had left and come back?

A    Several minutes.

Q    Okay.  And so what happened when you got back in the room?

A    I activated my Olympus digital recorder again.

Q    Okay.  And what was the first thing that you did with the defendant at that time?

A    I advised him since he recontacted, reinitiated contact with me that I would have to read him his Miranda rights.

Q    Okay.  Let me show you what's been marked as Government's Exhibit 7, and I also believe this is a defense witness -- or defense exhibit as well.

        MR. CHAPMAN:  No objection.

        MS. CORBIN:  What number is it on yours?

        THE COURT:  And it's Number 7, you said?

        MS. CORBIN:  Number 7, yes.

THE COURT: And were you moving to admit? I didn't hear.

MS. CORBIN: Yes, I would like to admit it. I can, I can lay a foundation, though, first if you would like. I don't think the defense has any objection.

THE COURT: Is there any objection?

MR. CHAPMAN: No objection to it.

THE COURT: Okay. So we'll just go ahead and admit it. You can still lay the foundation.

MS. CORBIN: Okay.

THE COURT: And I think for purposes of the record, this is also Defense Exhibit Number 1. We'll show both admitted.

BY MS. CORBIN:

Q   All right. It's slowly coming up on the screen, but you see a document here that's marked as Government's Exhibit 7?

A   Yes, I do.

Q   Do you recognize this?

A   Yes, I do.

Q   And what is it?

A   It's a U.S. Immigration and Customs Enforcement Statement of Rights form.

Q   Okay. And do you recognize it? Do you see any signatures on it that you recognize?

A   Yes, I do.

Q    Which one?

A    Mr. Edwards' name under the waiver portion.

Q    Right here?

A    Correct.

Q    Okay.

A    And then Agent -- or myself as the first witness and Agent McCarthy as the second witness.

Q    Okay.  And the date?

A    May 31st, 2016.

Q    Okay.  And do you recall filling out this form?

A    Yes, I do.

Q    And what parts of it did you fill out?  Do you remember?

A    I believe when I applied my print name, signature, and date.

Q    Okay.  And did you -- do you recall reading the defendant his rights?

A    Yes, I do.

Q    And did you read them from this form?

A    Yes, I did.

Q    Okay.  And I note here this line.  What does this say?  I was taken into custody at --

A    It says:  0600 hours.

Q    Okay.  On?

A    May 31st, 2016.

Q    All right.  And did you write that in?

A     I don't recall if I wrote it or if I instructed Kyle to apply that.

Q     Okay.  And was that correct, that he was taken into custody at 6:00 o'clock?

A     No.  That's when we first had contact with him was at 6:00 o'clock.

Q     Okay.  This form, is this one that you always use in any investigation --

A     Yes.

Q     -- where you're interviewing someone that you need to have a waiver form?

A     Correct.

Q     Is it a standard form?

A     Yes.

Q     They all look like this?

A     Yes.

Q     And -- okay.  When you read the rights to the defendant from this form and all of you were discussing and signing it, did you believe that the defendant at that time, did he seem to you to be coherent?

A     Yes.

Q     Did he understand what you were saying?

A     Yes.

Q     Did he understand the rights that you were reading to him, at least from what you could perceive?

A     Yes.

Q     And did he understand what he was waiving?

A     Yes.

Q     All right.  I'm going to turn this off so I can turn this back on and I will play for you -- well, maybe -- the -- you said you started a recorder on the second interview as well?

A     That is correct.

        MS. CORBIN:  I'll play for you the beginning of the second interview.

      (An audio recording was played.)

BY MS. CORBIN:

Q     Okay.  Is that how you recall the events happening that day?

A     Yes.

Q     And from there, after -- we could kind of hear signing or something happening.  Was that the signing of the form?

A     That is correct.

Q     All right.  And then from there did you ask more questions --

A     Yes.

Q     -- to the defendant?  Did you ask the defendant about search terms that he had used?

A     Yes, we did.

Q     And did he tell you about any types of search terms he had used?

A    Yes.

Q    What did he say?

A    I recall one search term was "mature women."

Q    Okay.  Did he say anything about searching for girls?

A    Yes.

Q    And then did he say -- did he express that he needed help?

A    Yes.

Q    And did he say why he looked for this pornography, this child pornography?

A    That he was bored with the other stuff.

Q    Other stuff being what?

A    I took him to mean regular pornography, adult pornography.

Q    Okay.  And at some point did he end the interview again?

A    Yes, he did.

Q    And let me rephrase.  Who specifically ended the interview?  Who ended the interview?  Whose choice was it to end?

A    Mr. Edwards.

        MS. CORBIN:  Okay.  This will be the last segment I'll play, and this is the conversation at the end of the interview.

    (An audio recording was played.)

BY MS. CORBIN:

Armstrong – Direct

Q    Is that the discussion about search terms?

A    Correct.

     (An audio recording was played.)

BY MS. CORBIN:

Q    Does that sound familiar?

A    Yes, it does.

Q    Okay.  And so he says he doesn't want to talk anymore?

A    Correct.

Q    And you end the interview?

A    Correct.

Q    And did you talk to Mr. Edwards any more after that?

A    Briefly, before he left for work.

Q    Tell me what happened after, after you shut down this interview that was happening and what happened next.

A    He requested to get some phone numbers out of his work phone before he left.

Q    Did you allow him to do that?

A    Yes.

Q    And was the cell phone part of your search?

A    Yes.  Electronic devices were.

Q    But you still allowed him to get cell phone numbers out of his phone?

A    Yes.

Q    Okay.  And why was that?

A    Because he had to go to work.

Q    Okay.  And so what happened after he got cell phone numbers or whatever he needed out of the phone?  And then what happened?

A    I think he got finished getting dressed and got the numbers, and then I walked him out to the driveway and he got in his work van.

Q    Okay.  And then, as far as you're aware, he went to work?

A    I presume.

Q    All right.  During any of the time that you had your interview with him or spoke with him, did you ever threaten him?

A    No.

Q    Did you promise him anything?

A    No.

Q    Did you ever use any deception with him?

A    No.

Q    Did you try to prevent him from going to the bathroom or getting drinks of water if he needed it?

A    No.

Q    In fact, we heard you offer or someone offer him water multiple times?

A    Correct.

Q    And did he get emotional?  We didn't hear it on this, the parts that we listened to, but did he get emotional at the second half of the interview?

A    Yes, he did.

Q    And did he ask for certain things when he was emotional?

A    Yes.

Q    What did he ask for?

A    Well, he made the statement that he needed help.

Q    Uh-huh.  Okay.  Did he ask for a tissue?

A    He may have.

Q    Okay.  What was his demeanor throughout the time that you encountered him?

A    He was calm and relatively quiet.

Q    And just a guess, or as far as you can recall, how long did the second interview take?  How much time passed?

A    I think approximately 12 minutes.

Q    Okay.  And after you shut down the second interview and he didn't want to speak anymore, did you tell him he could leave?

A    Yes.

Q    And what were the other agents doing while -- we heard them searching while you were talking with him, but after you finished the talk with him, what happened after that with the other agents?

A    I believe they were still in the process of searching the residence.

Q    Okay.  And then after Mr. Edwards left, did you interview anybody else?

A    Yes.

Q    Who did you interview?

A    Justin Losado.

MS. CORBIN:  Okay.  I'm going to -- I hate to turn this on just for this one thing, so I'm going to walk up and {indiscernible.}

Your Honor, I have Government's Exhibit 15 and it is the interview of Justin Losado, which is -- who is the roommate, that took place on the day of the search warrant, and it sounds like defense counsel doesn't object to its being admitted into evidence.

THE COURT:  Okay.  No objection, Mr. Chapman?

MR. CHAPMAN:  No objection.

THE COURT:  So Exhibit 15 will be admitted.

BY MS. CORBIN:

Q    Okay.  And, Special Agent Armstrong, after you finished the interview and the search warrant, how much longer do you believe you were at the residence that day to complete what you were doing?

A    I don't recall the time we cleared the scene.

Q    Okay.  A couple of hours?

A    Probably, yes.

Q    And then afterwards what did you do to memorialize your interviews and all that happened that day?

A    I drafted the police report.

MS. CORBIN:  Okay.  Your Honor, can I have a moment?

THE COURT:  Sure.

MS. CORBIN:  Your Honor, I have nothing further.

THE COURT:  Okay.  I think what we'll do is just take a brief recess, maybe ten minutes, and then we'll get started with cross-examination.

All right.

(Court recessed from 2:57 to 3:13 p.m.)

THE COURT:  Agent Armstrong, if you would like to come back.

THE WITNESS:  Thank you.

THE COURT:  Uh-huh.

And, Mr. Chapman, anytime you're ready.

MR. CHAPMAN:  Thank you.

CROSS EXAMINATION

BY MR. CHAPMAN:

Q    Good afternoon, Agent Armstrong.

A    Good afternoon.

Q    Did you have any indication prior to the execution of the search warrant that Mr. Edwards was armed or dangerous?

A    No.

Q    Did you have any indication that he had a criminal history?

A    No.

Q    In fact, he didn't, right?

Armstrong – Cross

A    Correct.

Q    You said that I believe 18 people showed up at his address at 6:00 in the morning, right?

A    That's correct.

Q    How many vehicles were there?

A    I do not recall.

Q    Was it more than one?  Obviously, you can't all fit in one car.

A    That is correct.

Q    I know that there were two Marana police officers, right?

A    Correct.

Q    Did they each have separate vehicles?

A    Yes.

Q    And you made sure that one was parked in front of his house with the overhead lights on?

A    That is correct.

Q    So that anybody in the house would look out and see the police presence, right?

A    Correct.

Q    Do you have a rough estimate of how many other cars were out front, five, ten?

A    A rough estimate would probably be approximately ten.

Q    Ten cars?

A    I encouraged agents to double and triple up, but I don't recall --

Q      Okay.

A      -- exactly how many vehicles.

Q      Parked out in front of Mr. Edwards' house, right?

A      Well, actually the house is on the corner of a cul-de-sac, so -- and I don't remember where everyone parked.

Q      What's that?

A      I don't remember where everyone parked.

Q      Well, was anyone parked in front of his driveway?

A      They may have been, yes.

Q      Yeah.  Well, the Tahoe was, right?  I mean, the Marana Police Department Tahoe was parked there so that he would see it, right?

A      No.  I had the vehicle park on the road, and the driveway comes off to the east into the cul-de-sac.

Q      Okay.  At any rate, his house is at the end of a cul-de-sac and you said that there were probably ten law enforcement vehicles there, right?

A      Approximately.

Q      And one of -- at least one had the overhead lights on, correct?

A      Yes.

Q      Did any other vehicles have their overhead lights on?

A      I do not recall.

Q      Everyone had tactical vests?

A      Yes, that approached the residence.

Q    Okay.  So they identified themselves as HSI agents?

A    Police markings.

Q    Okay.  Are they dark Kevlar vests?

A    Our vests are made of a nylon material that have pouches to insert the ballistic panels.

Q    Are they dark?

A    Dark blue.

Q    Yeah.  Now, according to your report, there were 12 HSI special agents present.  Were all of them armed?

A    Yes.

Q    And there was one HSI seized property specialist and three ICE interns.  Does that sound right?

A    Sounds about right.

Q    And then there were two Marana Police Department officers as well?

A    Correct.

Q    Okay.  And my understanding is that all these individuals were armed.  I don't know if the interns were, but was everyone else armed?

A    Everyone else was.

Q    Okay.  Do you know where Mr. Edwards' vehicle was?

A    His personal vehicle or work vehicle?

Q    Well, let's -- his personal vehicle.

A    I don't know if it was in the garage or the driveway.

Q    Okay.  He also had a work vehicle there?

A    Yes, a van.

Q    So you're not sure, but one was probably in the garage and one was parked in the driveway?

A    I believe the van was in the driveway, yes.

Q    Okay.  So your investigation leaded {sic} you to collect 15 images of suspected child pornography, right?  That was what caused you to get the search warrant in this case?

A    That is correct.

Q    All right.  Did you have any evidence in this case that Mr. Edwards was a suspect in hands-on child molestation?

A    At which point in the investigation?

Q    At any point.

A    No.

Q    When you got the search warrant, you got it in front of Judge Markovich, right?

A    That is correct.

Q    And did you tell Judge Markovich that you suspected that Mr. Edwards might be a child molester?

A    I do not believe I indicated that in my affidavit.

Q    Okay.  In fact, your affidavit, all it talks about is child porn, right?

A    I believe so.

Q    Not one instance, not one mention of you suspecting him of child molestation, correct?

A    I'm sorry.  Could you rephrase, please.

Q    At no point in your affidavit did you inform the issuing judge that you suspected of -- Mr. Edwards of child molestation, true?

A    I don't understand the question.

Q    Okay.  Did you ever tell Judge Markovich that you -- in your affidavit or at any time -- that you thought that Mr. Edwards was not only guilty of possessing child porn but also child molestation?

A    No, I do not believe I did.

Q    And that's because you had no evidence of that, right?

A    At that time, no.

Q    Do you now?

A    Several of the images depicted adults actively touching prepubescent children, hence the molestation.

Q    But you knew that when you got the warrant, right?

A    Yes.

Q    That's typical in child pornography cases, unfortunately. That's what you see, correct?

A    Correct.

Q    So you're not trying to conflate a child porn case with a child molestation case, are you?

A    I don't think "conflate" is the right word.  I think it could be a parsing of terms.

Q    Have you ever issued a warrant, sought issuance of a warrant in a child porn case where you also mentioned child

molestation as a possibility just simply because there are images that were found?

A    I've only done two, so I don't recall.  I do not think so.

Q    At any rate, you got the warrant.  You showed up at the house with 17 other law enforcement personnel at 6:00 in the morning; is that right?

A    The HERO interns are not sworn law enforcement officers.

Q    Okay.  So 15 total law enforcement officers?

A    Correct.

Q    Okay.  And you knocked on the door -- or actually you didn't knock on the door first.  First you rang the doorbell, right?

A    Correct.

Q    And nobody came to the door, correct?

A    Correct.

Q    And so then you banged on the door loudly with your first, right?

A    I actually rang the doorbell for a second time.

Q    Okay.  Then you banged on the doorbell with your -- on the door with your first?

A    Correct.

Q    You also had a battering ram there, true?

A    True.

Q    And that was right in front of the entrance to the house

Armstrong – Cross

when you arrived, true?

A    No.  The ram would have been with the stack of agents that were prepositioned near the edge of the garage in the driveway in case that device was needed to breach the door.

Q    What does it look like?

A    I don't recall the specific one that day.  Generally they're cylindrical, approximately 12 inches in diameter and approximately two and a half to three feet long with two handles to utilize the device.

Q    How much do they weigh?

A    They can vary, probably anywhere from 25 to 40 pounds.

Q    Now was Justin Losado the roommate mentioned in the search warrant affidavit?

A    Yes, he was.

Q    He was mentioned in the search warrant affidavit?

A    One of the vehicles registered that I saw outside the residence --

Q    Okay.

A    -- was coregistered with him and another subject.

Q    You informed the judge, however, that you had subpoenaed the IP address for the residence and determined that it came back to Kyle Edwards, right?

A    That is correct.

Q    So that's really who you intended to talk to when you arrived that morning?

A    At least him and any other occupants.

Q    Now all of the officers that arrived had markings identifying themselves as law enforcement, correct?

A    Yes.

Q    All right.  And when you approached the door, I think your testimony was after you found out that Mr. Edwards had a roommate inside that you escorted him out of the residence; is that true?

A    Yes.  I moved him, escorted him away from the front door.

Q    Okay.  Over to the driveway?

A    Yes.

Q    All right.  And then you sent in a team who placed Mr. Losado in custody, handcuffs behind his back, and put him in the living room, on the living room couch, correct?

A    That sounds correct.

Q    And after that, you escorted Mr. Edwards to the master bathroom, correct?

A    Correct.

Q    Do you know what the dimensions of the master bathroom are?

A    No.

Q    Did you do a diagram or do any measurements or did anyone from your team do that?

A    There was an agent who sketched the entire residence.

Q    And that's what we saw earlier in the hearing, right?

A    That is correct.

Q    Did anyone actually do a to-scale diagram of the bathroom so we can tell how big it is?

A    No.

Q    How wide it is, long, that type of thing?

A    No.

Q    Okay.  So when Mr. Edwards answers the door, what's he wearing?

A    I believe just a pair of shorts.

Q    So he doesn't have a shirt on?

A    No.

Q    No shoes?

A    I don't recall his footwear, if he had any footwear on.

Q    Well, you woke him up at 6:00 in the morning, so he probably didn't, right?

A    I don't know if I woke him up or if he was already getting ready for work.

Q    Okay.  At any rate, he's standing at the front door in his underwear, right?

A    I don't know if it was underwear or a pair of running shorts.  I don't recall.

Q    Okay.  At any rate, you have him come into the bathroom and ultimately Mr. Losado is allowed to sit on the back patio with an agent, correct?

A    Correct.

Q    Now at any time was Mr. Edwards left alone in the bathroom?

A    No.

Q    And you said that you wanted to keep Edwards and Losado separated, correct?

A    That is correct.

Q    And you did that, correct?

A    Yes.

Q    In fact, the whole time that Edwards was there, he was confined to the bathroom with no one around him except law enforcement personnel, correct?

A    Yes.

Q    And he actually had to sit on the bathtub, on the edge of the bathtub, I guess because there are no chairs in the bathroom, correct?

A    Correct.

Q    And was he still in his underwear?

A    I believe.  I don't know if it was underwear or shorts. I don't recall.

Q    Okay.  At any rate, he didn't have his shirt on, right?

A    Correct.

Q    And no one offered to let him get clothed, correct?

A    I don't recall.

Q    Well, if -- I assume that if someone had, it would be in one of your reports, correct?

A     Correct.

Q     And we can agree that that's not in your reports anywhere?

A     Correct.

Q     So to get the picture of what's going on at this point, 18 individuals have shown up with a battering ram, ten law enforcement vehicles; he's been placed in his bathroom with two other agents, in his underwear; and no one has said, hey, do you want to put your clothes on?  Is that basically where we're at at this point?

A     Yes.  I don't recall the clothing issue being broached.

Q     And one of the agents that was originally in the bathroom with him was a woman.  It's a female agent, correct?

A     Correct.

Q     Did you ever stop and think maybe that would be a little bit embarrassing to him to be sitting in the bathroom in his underwear with a female agent?

A     No.  Again, I don't know if it was underwear or if they were running shorts.

Q     And you did tell him that he was -- you did suggest to him that he was the subject of a child molestation complaint in the first statement, didn't you?

A     I don't know if I identified him specifically or just the overarching genesis of this case.

Q     Well, let's take a look at the statement that you took,

and I want you to look at Defense Exhibit I believe it's 2, which should be on your table, and let me know when you find it.

A    I'm here.  The blue sticker, Exhibit 2?

Q    Yeah.

A    Yes, I'm there.

Q    And go ahead and turn to page 8.

A    Okay.  I'm there.

Q    Got that?

A    Yes, sir.

Q    Okay.  Do you recall or do you see where you said to him: Like I told you, we received information about a child molestation complaint, so obviously -- and he says:  That's not -- that's not -- I just can't be.  And you say:  Okay.

    Why don't you keep reading for the next few questions and answers.

A    Starting with line No. 292?

Q    Yes.

A    Okay.  How do you want me to phrase this?  Do you want me to do the Q and the A or the question and answer?

Q    Yeah, go ahead and read all the way down to what you said ending at line 301.

A    Okay.  Okay.  So, Kyle, I would like to talk to you. This obviously isn't about me, right?  I don't know.  That's why I'm here.  You know we didn't just drive through the

neighborhood and pick your house, pick out your house, okay?

Yeah.

Q    Okay.  So just to stop you there, you tell him that he's the subject of a child molestation complaint and he asks if it's about him and you say:  We didn't pick out, we didn't just pick out your house, right?

A    Correct.

Q    Wouldn't that lead a reasonable person to believe that they were the subject of a child molestation investigation?

A    Possibly.

Q    And again, there's no reference to that in your search warrant affidavit, true?

A    I believe that is correct.

Q    I mean, did you tell -- I'm just going to quote from what you said to him and ask you if you told Judge Markovich this.  Quote:  We received information about a child molestation complaint.

        MS. CORBIN:  Your Honor, objection, asked and answered.  He's answered this numerous times that he's not mentioned this to Judge Markovich.

        THE COURT:  I'll let him answer.  It's okay.  Go ahead.

BY MR. CHAPMAN:

Q    Did you tell Judge Markovich that?

A    I'm sorry.  Could you repeat, please.

Q    I'll move on.  All right.  Let's see.  So you did not read Mr. Edwards his Miranda rights at the beginning of the first interview, correct?

A    Correct.

Q    And by asking him about a child molestation investigation, I mean, that really was a misdirection, wasn't it, because what you were there for was an investigation of Internet child porn activity?  I mean, that's a strategic law enforcement misdirection, basically?

A    I would disagree.

Q    Really?

A    Several of the images, as I stated previously, showed the prepubescent underage females being touched by male adult anatomy, which I believe falls under the category of molestation.

Q    That's child porn and that's basically all child porn is. Did you have any other evidence that Mr. Edwards was actually molesting children?

A    Not at that time.

Q    And you still don't?

A    Correct.

Q    The Miranda waiver that's been admitted has Mr. Edwards in custody from 6:00 o'clock in the morning, and you discussed that with the prosecutor.  You're aware of that, right?

A    Yes.

Armstrong – Cross

Q    And I mean you were aware of that when you read the waiver to Mr. Edwards too, weren't you?

A    I'm sorry.  Aware of what?

Q    You were aware that the waiver said he was in custody from 6:00 o'clock in the morning?

A    The way -- the form is boilerplate language that is used mainly by HSI agents for in-custody arrests.  I did not draft that Miranda form.

Q    But you filled it out, right?

A    Yes.

Q    And the parts that you filled out aren't boilerplate; they're case-specific, correct?

A    The actual time and dates, yes, are case-specific.

Q    And that's what you filled out and you said that he was in custody from 6:00 o'clock in the morning?

A    I believe I stated -- I corrected and said that he was -- I misspoke and said he was detained since 6 a.m.

Q    Well, what's the difference?

A    Because I subsequently advised him that it was a voluntary interview and I happened to be using a form that my agency uses.

Q    Well, let's talk about exactly what you said to him when we go over this Miranda waiver.  Go ahead and look at Defense Exhibit 3, which is the second statement.  Let me know when you find that.

A    I have Exhibit 3.

Q    And go ahead and turn to the bottom paragraph on page 3.

A    Okay.  I'm there.

Q    Okay.  Halfway through that paragraph there's a sentence that starts with:  It says, I was.  Go ahead and read that.

A    It says, I was taken into custody, period, that you were detained at 6:00 o'clock on today's date, May 31st, 20 -- I believe that's an error.  I don't know if I said 2106.  I think it's supposed to say 2016 -- and have signed this document at -- there's a hyphen.  There's a space for date and time, period.  So, hyphen, here.  I'm going to move this mug, hyphen, on the waiver you have the right to review this, period, print your name, period, sign it and, hyphen, and the two of us will witness that, period.

Q    Thank you.  So it sounds like -- first of all, it sounds like from reading that that you asked him to sign his name and date it, correct?

A    I'm sorry.  Could you repeat that, please.

Q    You say:  Print your name, sign it, and the two of us will witness it.  So you asked him to print his name and sign it?

A    Correct.

Q    And you did the rest.  Everything else was filled out either by you or Agent McCarthy, correct?

A    Correct.

Q    Including -- and this exhibit has been admitted into evidence now, Exhibit 1, Your Honor -- the part that says, quote:  I was taken into custody -- and then handwritten in -- at 0600 on 05-31-16.

Now you wrote that, right?

A    In the form?

Q    Yeah.

A    Correct.

Q    And then you had an opportunity to correct that time if you thought it was wrong during the interview because you said:  It says that you were detained at 6:00 o'clock on today's date.  But you didn't correct that, right?

A    Correct.  I mistakenly did not correct the time.

Q    So you told him he was in custody at 6:00 o'clock a.m. on the morning of this interview, right?

A    I never told him he was in custody.

Q    You told him he was detained at 6:00 o'clock, right?

A    I told him at the initial entry to the search warrant, at the door and when I removed him from the door.

Q    Well, hang on.  We're just talking about when he gave the second statement now.

A    Okay.

Q    During the second statement you told him, quote, that you were detained at 6:00 o'clock on today's date.  That's what you told him?

A    That is correct.

Q    And you didn't correct that.  You didn't say, oh, wait, this is wrong, he really wasn't in custody, he really wasn't detained, right?

A    Correct.

Q    At any point in time did anyone say to him, Kyle, do you want to put some clothes on?

A    I don't recall.

Q    You took his phone away also, right?

A    Correct.

Q    And so again for context, he's in this room with two agents, he doesn't have his phone, and he asks the agents on two separate occasions if he could use the phone to call his employer and let him know he would be late.  Was he allowed to do that?

A    Not at that time.

Q    Why not?

A    I was afraid that if we gave him physical access to his phone, that if there was any evidence, that he could possibly manipulate it and/or delete that evidence on that device.

Q    Did you ever think that maybe he could be given another phone that wasn't the subject of the search warrant or he could use a land line?

A    Well, I advised him that he could get numbers out of the phone because he was on his way to work shortly thereafter.

Q    Well, let's just cover exactly what he was told.  Again, I want to go back to Exhibit 2.  We'll go to page 25.  That's his first statement.

A    I'm sorry.  Did you say page 25?

Q    Yeah.

A    Okay.  Okay.  I'm there.

Q    And you're talking at line 1061.  He says:  Work gave it to me.  It's an iPhone.  He's talking about his phone.  And at 1065 he says:  Actually, can I text him and let him know I'm going to be late?  And your answer is:  In just a minute.  And he says:  I need to let him know.  And you say:  We'll probably be done shortly.

     So can we agree that the message that you're sending to him at that point is:  You ain't talking to anybody until you're done talking to me?

A    No, I would disagree with that assessment.

Q    Well, you wouldn't let him use the phone, right?  He wanted to text his -- he wanted to text his boss and you told him he couldn't until you were done, right?

A    I advised him that we would probably be done shortly so therefore he could be on his way to work and that he could remove numbers, we could assist him with removing numbers.

Q    That's not what the statement says.  That's not what I just read.  You just said:  We'll be done shortly.  You know, the statement is the statement.  I don't want to quibble about

it.

A    Okay.

Q    Let's move on to the second statement and let's go to page 8.

A    Of the same exhibit?

Q    No.  It would be Exhibit 3.

A    Okay.

Q    And look at page 275.

A    Did you say page 8?

Q    Page 8, line 275.

And, Your Honor, I apologize for my language.  I'm going to use profanity.

THE COURT:  It's okay.

BY MR. CHAPMAN:

Q    But he says:  Fuck.  Can I at least text work before you take my phone?  And your answer is:  Yeah, we'll allow you to do that.  We'll allow you to text work.  We'll allow you to get numbers out because we understand that nowadays people don't memorize phone numbers.

Okay.  You told him you would let him use his own phone, right?

A    Yes.

Q    Ultimately, he didn't get to use his phone until he was done with this second statement?

A    Correct.

Q    Do you agree with me that telling someone that you'll let them use something that they own is an indication that you're in control of the situation, not the person you're interviewing?

A    Could you restate that, please.

Q    Is there something confusing about it?

A    It was just a long statement.  I'm trying to digest it.

Q    If you tell somebody that you're going to allow them to do something, that means you're -- that suggests to that person that you're in control, correct?

A    Uh --

Q    Well, let's just use the courtroom.  I say:  Agent, can I use the bathroom now?  Or I should better say, Judge.  Judge, can I use the bathroom?  And the Judge says:  I'll allow you to do that later.

     That -- the Judge is in charge, right?  She's telling me she's in charge and I can't do it now, I've got to do it later, correct?

A    Correct.

Q    He never was able to use his phone during either of these two interviews, right?

A    Correct.

Q    And when he finally left that day, you guys had to move your law enforcement vehicles out of the way so he could get his car out of the garage, correct?

A    I don't know.  I thought -- I think he took his work van, but I don't know if the cars were blocking the driveway or not.  I don't recall.

Q    It's just, I mean, you testified that you told him he was free to leave.  Where was he going to go?  I mean --

A    He said he had to go to work.

Q    -- there were 18 agents in his house and he couldn't drive his car anywhere.  I mean, where is he supposed to go in his underwear?

A    He was allowed to go to work.  He said he wanted to go to work and he had to go to work.

Q    Between the first statement when he asked for an attorney and the second statement, only seven minutes elapsed, right?

A    I don't know the exact --

Q    Well --

A    -- time.

Q    -- I'll just avow for the record that there's seven minutes between the termination of the first interview and the beginning of the second one.  Did somebody stay in the room with him in that time frame?

A    Agent McCarthy.

Q    Did anyone tell him, do you want to get your clothes on and you can leave now?

A    I don't know.

Q    Why was he kept -- why was he still kept in the room

Q    between the first and the second interview, the bathroom?

A    I don't know what he was doing.

Q    But why was he kept there?  You were in charge in the investigation.  Why was he kept in the room between the first interview and the second one?

A    I don't know.

Q    Did anyone say, okay, we're done here, you can go to work?

A    Several times through the interviews we --

Q    No, no.

A    -- advised him that.

Q    I'm sorry.  I interrupted you.  Go ahead and finish your response if you haven't.

A    I guess I'm sorry.  I interrupted your question --

Q    That's okay.

A    -- before you finished.

Q    Well --

A    Could you repeat the question.

Q    -- my question was, you know, I understand that you said he was free to leave during when you were recording the statements, but in that seven-minute gap between the first and the second interviews, there's no indication anybody ever told him, hey, you can leave; here, go get your clothes on; you can go to work.  I mean, you just left, right?

A    I did, yes.

Q    Did anybody say, we're done here, you can go to work or you're not under -- you know, this is it, this is the end of the investigation?

A    I don't know.

Q    You're free to leave?

A    I don't know.

Q    Instead, Agent McCarthy stayed in the room and kept talking to him, right, about pornography addiction and counseling, that type of thing?

A    I don't know the exact language discussed after I stepped out.

Q    And he's still there just in his underwear or his shorts or underwear, right?  No shirt on?

A    I don't know when he started to put his work clothes on.

Q    Well, it wasn't until after the second interview, right?

A    I don't know for sure.

Q    Why -- you know, after the first interview and he invoked his right to counsel, why wasn't he left alone?  Why was there still an agent in the bathroom with him?

A    For officer safety reasons.  We don't know where occupants of a residence may hide a weapon.  I mean, we do do searches, but we don't find them, all weapons in a house, and if he was left alone, he could possibly gain access to a weapon and use it against the agents.

          MR. CHAPMAN:  Can I have just a minute, Your Honor?

THE COURT:  Sure.

MR. CHAPMAN:  Your Honor, I don't have any further questions.  We do have an out-of-state witness that I think we've agreed that we can call out of order.

THE COURT:  Okay.

MR. CHAPMAN:  I don't know if you want to finish your redirect.

MS. CORBIN:  It would be better.  I won't be very long.

MR. CHAPMAN:  Okay.

THE COURT:  Okay.  Why don't you go ahead and do redirect and then we'll call the next witness.

MS. CORBIN:  Thank you, Your Honor.

THE COURT:  Sure.

REDIRECT EXAMINATION

BY MS. CORBIN:

Q    All right.  Special Agent Armstrong, I just want to clarify a couple of things.  Defense counsel asked you about initially when you came into the house at the beginning of the execution of the search warrant that he asked you or he said then you took Losado, Losado -- I'm probably mispronouncing the name -- took Losado into custody.  Did you ever take Losado into custody?

A    No.  He was briefly detained.

Q    And tell me about the brief detention.  What is the brief

detention and why do you do it?

A     We do it for officer safety reasons.  Usually adults, who have the knowledge about weapons and the ability to use them against officers, we handcuff them briefly because we don't know how many other occupants we may encounter in a residence and if they will be armed or if they will comply with our verbal commands or not, so therefore we detain the adults like that.

Q     And when are you talking about that you do this brief detention?

A     Upon initial contact while clearing the residence.

Q     And is that the only time that you do the brief detention?

A     Yes.

Q     And then after the house is cleared -- this is at the beginning of an execution of a search warrant when you first make entry?

A     Correct.

Q     And after the house is cleared, are those people still detained, whoever has been put in brief detention?

A     No.

Q     And if they were in handcuffs, do they get taken out of handcuffs?

A     That is correct.

Q     And is that what happened on that day?

A     Yes.

Q     Losado, had he been put in handcuffs temporarily?

A     Yes, he was.

Q     For the brief detention?

A     Correct.

Q     How about Edwards?

A     No.

Q     He wasn't put into handcuffs?

A     No.

Q     Was he still briefly detained at the beginning while you executed the clearing of the house?

A     Yes.

Q     So taking you to Exhibit, Government's Exhibit 8 -- I believe it's 8 -- the -- no, I'm sorry, not 8.  The waiver form, 7.  You were -- we've now listened to the audio of this discussion about the signing of this form as well as you've actually read through the transcript that defense counsel provided, and you noted in your statement regarding something about the 6:00 o'clock hour that you wrote in?

A     Correct.

Q     Can you tell me what you were trying to explain just briefly about why you, in your statement, said detained?

A     Because upon the initial contact, before the scene is secured, we do detain all the adults that we encounter for officer safety reasons.

Q     So when you were filling out this form with the defendant -- and I have to find the exact page it was, but when you read -- you were reading the form and defense counsel had you read it, it said:  You were taken into custody.  And then you briefly stop and say --

A     Detained.

Q     At 6 a.m.; is that right?

A     Correct.

Q     Why did you orally make that change?

A     Because in my mind he was not taken into custody.  He was briefly detained.

Q     Okay.  So I think you testified you mistakenly didn't change the time on the form, but you did orally change the statement to the defendant when you were explaining the form to him; is that right?

A     Correct.

Q     Because you explained that was detained at 6:00?

A     Correct.

Q     And that was true.  He was briefly detained at 6:00?

A     Correct.

Q     Okay.  Defense counsel also stated that the defendant Edwards was, quote-unquote, "confined in the bathroom."  Was he confined in the bathroom while you were speaking with him?

A     Confined in what way?

Q     Was he handcuffed?

A    No.

Q    Was he somehow inhibited from moving around the bathroom?

A    No.

Q    Was the door closed completely?

A    No.

Q    Was he, was he -- did you tell him that he was under arrest?

A    No.

Q    And you told him actually that he was free to go, that he could leave, he didn't need to speak to you?

A    Several times.

Q    You were asked a lot about and defense counsel talked a lot about the defendant being in underwear.  If you -- would you have possibly made a note of what the defendant was wearing in your report?

A    Yes.

Q    You don't -- so you say you don't recall today, but if I -- is there something that I could show you that could refresh your recollection potentially of what he was wearing that day?

A    My police report.

Q    Okay.  I believe you have a stack of the government's exhibits up there.  I would like to show you just for your review Government's Exhibit Number 5.

A    Okay.

Q    Do you see that?

A    I'm at Exhibit 5.

Q    And just do you recognize what that is and can you tell us what that is?

A    That's the police report I drafted.

Q    And so you wrote this report?

A    Yes, I did.

Q    And when would you have written it, soon after the investigation?  You don't have to give me a date.  Soon after --

A    Yes.

Q    -- the day that you executed the search warrant?

A    Yes.

Q    Okay.  I would like to have you review the third page of the report and then see if you can answer my question as to what the defendant -- you noted what the defendant was wearing that day.

A    Okay.  I reviewed it.

Q    Okay.  Can you tell me what he was wearing that day?

A    Only a pair of shorts.

Q    Okay.  It doesn't say underwear?

A    No.

Q    Okay.  Okay.  I would also like to show you what's been marked as Government's Exhibit 9.  This, I -- you know what?  Actually, I'll -- Your Honor, may I approach?

THE COURT:  Uh-huh.

MS. CORBIN:  {Indiscernible.}

THE WITNESS:  Sorry.

MS. CORBIN:  Hold on a second.  {Indiscernible} terminal.

THE COURT:  I think it might still be on the --

MS. CORBIN:  Computer?

THE COURT:  -- the computer.  You might have to --

MS. CORBIN:  Ah.  There it is.  Okay.  Oh. {Indiscernible.}

THE CLERK:  Uh-oh.

THE COURT:  Uh-oh.

MS. CORBIN:  Oh, there it is.  Okay.  Phew.

BY MS. CORBIN:

Q    All right.  I'm showing you what's been marked as Government's Exhibit 9, and this is actually a multipage exhibit that I will flip through the pages here.  Do you recognize this?

A    Yes, I do.

Q    And what is it?

A    It's my application for the search warrant.

MS. CORBIN:  Okay.  And, Your Honor, I would ask that this exhibit be admitted into evidence.

THE COURT:  Any objection, Mr. Chapman?

MR. CHAPMAN:  Yeah.  I guess my objection is it's not

complete.  It doesn't have the affidavit.  So I'm not sure why it needs to be admitted or the purpose.

THE COURT:  If you want to explain or ask some questions as to how it's relevant.

MS. CORBIN:  Okay.  The reason -- well, I can argue that the reason that I believe it's relevant is that defense counsel made a lot of questions about the usage of the cell phone during the time of the execution of the search warrant, and I wanted to discuss with the witness what exactly was a part of the search warrant and what was, according to the search warrant, allowed or supposed to be seized at the time of the execution of the search warrant, which includes cell phones, and that's why I believe it's relevant.  And actually the affidavit I don't think is relevant to that.  It's basically what the court has approved the witness and the agents to seize that day.

MR. CHAPMAN:  Well, Your Honor, I mean, we could probably save some time.  For purposes of this hearing, I'll agree that the cell phone was one of the subjects of the search warrant.

THE COURT:  Okay.

MS. CORBIN:  I would also ask that the exhibit be admitted merely because it actually says that, and also there are some photographs attached that I would like to ask him about.

THE COURT:  Over the defense objection, I will admit it for whatever purposes may be relevant.  I mean, it's clear the Court knows what the search warrant is for, but I'll go ahead and admit it.

MS. CORBIN:  Thank you, Your Honor.

BY MS. CORBIN:

Q    This was a search warrant that you obtained?  I know it's crooked here.

A    Yes.

Q    Okay.  And is this a photograph of -- one of the photographs that you took or one of the agents took before obtaining the search warrant?

A    Yes.

Q    Is that the residence you searched?

A    Yes.

Q    Is that also the defendant's work van you were talking about?

A    Yes.

Q    Was this the location it was parked at the time that you executed the search warrant?

A    I don't know its position, I don't recall its position in the driveway.

Q    Okay.  And this is Attachment B, which talks about what you're there to seize and obtain; is that right?

A    That is correct.

Q    And Section A lists cellular phones; is that right?

A    Yes.

Q    Okay.  So defense counsel asked you a lot of questions of whether you were in control of the cell phone that day, the defendant's cell phone, and did the search warrant give you the authority to seize cell phones at the residence that day?

A    Yes, it did.

Q    And was that the intention was to seize the defendant's cell phone that day?

A    Yes.

Q    And to search the defendant's cell phone that day?

A    Yes.

Q    And the search warrant authorized you to do that?

A    Yes.

Q    And what was your concern about allowing him to have access to the cell phone to manipulate the cell phone himself?

A    If the cell phone possibly contained evidence, I did not want him to have access to it to potentially alter or delete the evidence.

Q    Okay.  And is that something that's possible for somebody to do if they were manipulating the phone?

A    Yes.

Q    And so for that reason you didn't want to allow him to use the phone?

A    Correct.

Q    Ultimately, did you allow him to retrieve phone numbers from the phone?

A    Yes.

Q    Afterwards, after all the interviews?

A    Correct.

Q    And was somebody with him while he was using the phone and manipulating the phone to get the numbers, or did somebody retrieve those numbers for him?

A    I don't recall exactly how the removal of numbers occurred.

Q    Would he have been allowed to obtain the phone numbers on his own with that phone and manipulate the phone on his own that day?

A    No.

Q    Okay.  You also said that the house was on the corner of a cul-de-sac, but then that kind of got rephrased to being in a cul-de-sac.  Which was it?  Was it on a corner of a cul-de-sac or in a cul-de-sac?

A    It was, if you will, the front corner of the beginning of a cul-de-sac.

Q    Okay.  So not necessarily in it but like on the edge of it?

A    Right.

Q    The entry of it?

A    Right.  The photo with the van --

Q    Uh-huh.

A    -- that, the driveway empties out into the cul-de-sac. However, the front of the residence faces Kiwi Lane.

Q    Okay.  All right.  And then you were asked why he remained in the room during the break between the two interviews.  Did someone tell him that he couldn't leave?

A    I don't know.

Q    Did you tell him?  Did you tell him that he couldn't leave?

A    No.

Q    Did you actually tell him he was free to leave?

A    Several times.

Q    Okay.

     MR. CHAPMAN:  Well, can we just clarify that testimony foundationally as to when he was told that?  Was it between the two interviews or was it on tape during one of the interviews?

     THE COURT:  And, Ms. Corbin, if you can clarify when the agent said he was free to leave.

BY MS. CORBIN:

Q    Did you tell the defendant periodically, numerous times throughout your interview with him, that he was free to leave?

A    Yes.

     THE COURT:  Which interview?

BY MS. CORBIN:

Q    During both of the interviews, did you tell him numerous times that he was free to leave?

A    Yes.

Q    Did you tell him at the beginning of your interviews with him, before you even started recording, did you tell him that he was free to leave and not under arrest?

A    Yes.

Q    And did you tell him after, before the break between the two interviews, did you tell him he was free to leave?

A    Yes.

        MS. CORBIN:  Does that clarify for Your Honor?

        MR. CHAPMAN:  I'm still not sure because there's a seven-minute period that's not recorded, and I'm not sure what his testimony is as to what he told him in that time frame.

        THE COURT:  So, Ms. Corbin, why don't you clarify before the first interview started, during the first interview, after the end of the first interview, the time between the first and the second interview, and then again beginning of the second interview --

        MS. CORBIN:  Okay.

        THE COURT:  -- end of the second interview.

BY MS. CORBIN:

Q    Okay.  Did you tell him before the first interview, before you started recording, that he was free to leave and not under arrest?

A    Yes.

Q    Did you tell him numerous times during your interview, which I believe is in the recording, that he was free to leave and he was not under arrest?

A    Yes.

Q    Did you tell him after the finish of the first interview that he was free to leave?

A    Yes.

Q    Were you there during the break period when Agent McCarthy and he were in the bathroom?

A    No.

Q    So you don't know what happened between the two of them?

A    No.

Q    When you go back for the second interview and you start recording, did you tell him that he was free to leave and not under arrest?

A    Yes.

Q    And then when the interview -- and did you -- at the end of that interview, when the second interview ended, did you tell him he was free to leave?

A    Yes.

Q    Did he ultimately leave?

A    Yes.

        MS. CORBIN:  Okay.  Your Honor, can I have a moment?

        THE COURT:  Sure.

MS. CORBIN:  Your Honor, I have nothing further.

THE COURT:  Okay.  Thank you.

MR. CHAPMAN:  Your Honor.

THE COURT:  Sure.

MR. CHAPMAN:  I just have to clarify.  Can I have a couple follow-up questions?

THE COURT:  Okay.

MR. CHAPMAN:  I know.

THE COURT:  I just want everyone to be aware of the time, and you're telling me there's an out-of-state witness, so go ahead.

MR. CHAPMAN:  Well, this is pretty important, so --

THE COURT:  Okay.  Go ahead.

RECROSS EXAMINATION

BY MR. CHAPMAN:

Q    So you're saying that at the end of the first interview, you told him he was free to leave.  Is that what you're saying?

A    Yes.

Q    Where is that in your reports?  It's nowhere in your reports.  Did you document that anywhere?

A    I may have in my report.

Q    Well, have you reviewed your reports before the hearing today?

A    Yes, I did.

Q    Will you accept my avowal that there's nothing in your reports saying that you said he was free to leave at that point?

A    At what point?

Q    After the first interview.  You never documented that?

A    When the tape was on or the tape was off?  I guess I'm confused.

Q    After the tape was turned off, in that seven-minute time frame, you never told him he was free to leave.  That's what I want to clarify.

A    I was -- I left the room to check the progress of the search warrant.

Q    And you never told him -- so that we're clear, in that time frame, you never told him he was free to leave?

A    After the tape was turned off or --

Q    Yes, yeah.

A    I believe I did, but --

Q    Is it documented anywhere?

A    No.

        MR. CHAPMAN:  Okay.  I have no further questions.

        THE COURT:  Okay.  Thank you.

    Agent Armstrong, you may step down.

        THE WITNESS:  Okay.

        THE COURT:  And then who is the out-of-state witness that we're calling?

MR. CHAPMAN:  Justin Losado.

THE COURT:  Okay.  Mr. Losado, go ahead and come forward and if you would like to take a seat right up here.

THE WITNESS:  Right where you are, right here?

THE COURT:  Right up here.  And there's cups and water if you need it while you're testifying.

THE WITNESS:  Thank you, Your Honor.

THE CLERK:  Before you sit down, you have to stand and be sworn.

THE WITNESS:  Oh.

THE COURT:  Sorry.

THE CLERK:  Do you solemnly swear that the testimony you're about to give in this matter now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE CLERK:  Thank you, sir.  You may be seated.  And as you are, please speak directly into the microphone and please state your name for the record and spell your last.

THE WITNESS:  Would you like a full name?

THE CLERK:  Yes, please.

THE WITNESS:  Justin Emmanuel Losado.  And you said spell it?

THE COURT:  Yes, please.

THE WITNESS:  J-U-S-T-I-N, E-M-M-A-N-U-E-L, L-O-S-A-D-O.

THE COURT:  Thank you, Mr. Losado.

Mr. Chapman, go ahead.

JUSTIN E. LOSADO, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. CHAPMAN:

Q    Mr. Losado, I want to ask you a couple questions about Kyle Edwards.  Do you know him?

A    I do.

Q    Okay.  Do you recognize him in the courtroom now?

A    I do.

Q    Okay.  Were you a roommate of his back in 2016?

A    I was.

Q    All right.  We're going to talk about that in a minute, but tell me a little bit, tell the Court a little bit about yourself.  Are you employed?

A    I am not.  I'm a 100-percent disabled veteran.

Q    Okay.  You said you're a veteran?

A    Yes.  I'm an Army veteran.

Q    Okay.  And you're disabled for -- what's the diagnosis that you're --

A    80 percent PTSD and 20 percent other physical issues.

Q    Okay.  And when did you serve?

A    From 1998 to 2000.

Q    Okay.  Drawing your attention back to May of 2016, were you living with Kyle Edwards?  Do you recall that?

A    I do.  I lived with him for a little bit.

Q    Okay.  And do you remember the address?

A    I've had a lot of addresses in Arizona.

Q    If you don't remember, that's fine.

A    It was Kiwi Lane.  It was Kiwi Lane.  That's --

Q    Does 7230 West Kiwi Lane --

A    Yeah, that's it.

Q    Okay.  Can you describe how big the residence was?

A    It was a smaller three-bed/two-bath and 12, 13, 1400 square feet.

Q    All right.  And you lived in one bedroom; he lived in one of the other bedrooms?

A    Yeah.  Well, he actually had the whole house.  I just had the bedroom and the bathroom.

Q    You were just renting from him?

A    Just the room, yeah.

Q    Okay.  Did there come a time in the early morning hours of I believe it's May 31st, 2016 when something startling happened?

A    Yeah.  At 6:00 in the morning, around 6:00 in the morning, I was woken up with a bang on my door, banging.  They announced who -- either Homeland Security, whatever, whoever they were, whatever they said at the moment.  But I was just, I was waking up.  That woke me up.  And so as I opened my eyes and looked towards the hallway where the door was, it flung

open and was the agents in the hallway pointing their guns at me and telling me to get on the ground.

Q    How many agents were there?

A    More than I could count.  The hallway was narrow and there was -- they were all wearing black, so it's just heads and hands and weapons and there was a lot of people in that hallway.

Q    Do you remember what they told you?

A    Yeah, to get on the ground.

Q    And did you do that?

A    And I did.  And they handcuffed me.  They brought me out to the living room.

Q    Let me stop you there for a second.

A    Sure.

Q    So what were you wearing?

A    So I slept in my underwear.  It's hot in Tucson.

Q    We know that.

A    Yeah.  So I was in my underwear as I woke up.  I was on the ground in my underwear.  They handcuffed me in my underwear and brought me to the living room in my underwear.

Q    Okay.  Were you handcuffed in the front or behind?

A    Behind.

Q    Okay.  Where did they put you in the living room?

A    On the couch.

Q    Okay.  Did you see other agents in the house at that

point?

A    Yes.

Q    About how many were there?

A    There were quite a few buzzing around, a lot.  I would say around 20.

Q    Around 20?

A    Yeah.

Q    Were they armed?

A    Yeah, that I remember from the hallway.

Q    Okay.

A    It's just a lot of activity and trying to wake up and process what's going on.

Q    Right.  So you're sitting there on the couch with your hands cuffed behind your back?

A    Uh-huh.

Q    In your underwear, right?

A    Yeah.

Q    How long were you sitting on the couch?

A    30, 40 minutes, somewhere around that, maybe a little less, a little longer.

Q    Okay.  And were you allowed to use a phone?

A    No.

Q    Were you -- do you feel like you weren't free to leave at that point?

A    I mean, I'm in handcuffs.  I'm sitting on the couch in my

Losado - Direct

underwear.  As they did whatever business they had to do, I don't feel like I was free to leave.

Q    Okay.  At some point were you moved?

A    Eventually, after they got done doing whatever they were doing, yeah, I got to get my pants on and then they placed me in the back yard.

Q    Okay.  So when you say back yard, you mean the back patio?

A    Yeah, back patio.

Q    And were you left alone in the back patio?

A    No.  There was an agent with me.

Q    Okay.

A    Kind of standing watch or whatever.

Q    At any point in time from the point that the law enforcement arrived and got you out of bed to -- to that point, had you been outside the presence of an agent?

A    No.

Q    Did you feel like the agent in the back yard was there to monitor your actions?

A    Yeah.

Q    Okay.  So how long did you wait in the back yard before the next thing happened?

A    I was in the back yard for a good few hours while they questioned Kyle and kind of did their thing about the house, and, yeah, maybe 10:00 o'clock, 9:00-something was when they

came and finally got me to take me in.

Q    And when did you -- when did they actually let you put your pants on?

A    I want to say it was 20, 30, 40 minutes.  I don't remember.  I really just don't --

Q    Was it after you got out on the patio?

A    No.  I had the pants on before.  Yeah, I had the pants on before I went to the patio.

Q    Okay.  So you asked them and they let you put your pants on --

A    Yes.

Q    -- at that point?

A    At some point before the patio, yes.

Q    Okay.  Did you -- when you got out -- well, let me back up.  The agents that you saw in the house, were they wearing tactical vests?

A    They were.

Q    Did they have markings on it indicating that they were law enforcement?

A    They, they were, yeah.

Q    Okay.  And each one, to your knowledge, had at least a sidearm?

A    From my recollection, yeah, at least a sidearm.

Q    And I think you estimated there were like 20 agents, something like that?

A    About.

Q    Okay.  So let's fast-forward again.  You're out on the patio.  You're being monitored by an agent.  Did you feel like you were free to leave?

A    No.

Q    Why not?

A    I mean, the presence itself and the procedure.  As a military guy, you know, I know law enforcement.  They have to do what they have to do.  There's, there's -- I have to be there.  This is important, whatever is happening.

Q    Okay.  Were you ever allowed to have any contact with Kyle Edwards?

A    No.

Q    Were you -- when they arrived, was it a scary experience for you having guns pointed at you?

A    Yeah, yeah, quite -- I mean, just waking up that way, I didn't know what was going on for a good portion of the beginning of that morning, so yeah.

        MR. CHAPMAN:  Okay.  I have no further questions.

        THE COURT:  Okay.  Thank you.

    Mr. Rossi.

        MR. ROSSI:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. ROSSI:

Q    Good afternoon, sir.  I just have a couple questions for

you.  When you said that you were outside for a couple hours --

A      Uh-huh.

Q      -- was that the entire time or between the time that you were taken out there and when you were interviewed?

A      Yeah.  That was, that was after the underwear incident, so --

Q      Right.

A      -- yeah, after the underwear incident, they put me to the back patio and then that was until the interview.

Q      Okay.  So you're saying that took a couple hours?

A      Yes.

Q      Would it surprise you if they interviewed you at 7:38?

A      I was already surprised.  I don't think I could have been any more surprised that morning.

Q      Well, if we played the interview and/or showed you a report and it said 7:38, would you quibble with that or would that be about right?

A      I would think it's a little later, at least to my recollection.  I felt like I was out there a few hours.

Q      All right.  With regard to the first interaction with the agents --

A      Uh-huh.

Q      -- later on, did I think it was Special Agent Armstrong explain to you that they had done so for the purpose of

detaining you to make sure that there were no weapons in the house?

A    They did.

Q    And did he also explain to you that they don't know you and so they had to do that, but he made sure to tell you that you weren't under arrest?

A    They did.

Q    Okay.  And then did he also tell you that you had the option to leave?

A    They did.

Q    And did he tell you that you did not have to talk to him?

A    I believe so, yes.

Q    Okay.  And then after you were done talking to Special Agent Armstrong, did he tell you again that you either could hang out until the end of the search or you could take off and go somewhere else for a little while and then come back?

A    They may have said that.  I don't remember that exactly.

Q    I guess what I'm getting at is, did they take steps to let you know that you were not under arrest and that you could leave the house when you wanted to?

A    They mentioned that a few times when I was -- during the interrogation and even before the interrogation, but I still did not feel like I could leave.

Q    So they told you that before they talked to you, they told you that while they were talking to you, but you felt

that you couldn't leave?

A     Right.

        MR. ROSSI:  Okay.  Give me one second.  One second, Your Honor.

        THE COURT:  Sure.

        MR. ROSSI:  Thank you.

BY MR. ROSSI:

Q     Oh, I did have one more question.

A     Sure.

Q     In your interaction with Special Agent Armstrong and another agent that was there, when you guys were talking, was it relaxed?

A     It was relaxed later.  Once, once they explained to me what was exactly going on -- and I didn't get that explanation for, you know, the time I was outside until they brought me in, so that period when I was unsure of -- when they brought me in there, explained the situation, it did become a little more relaxed and they were actually really nice to me.

        MR. ROSSI:  Okay.  I don't have any further questions, Your Honor.  Thank you.

        THE COURT:  Okay.  Thank you.

    Any redirect, Mr. Chapman?

                    REDIRECT EXAMINATION

BY MR. CHAPMAN:

Q     So, just so I understand, even though they told you you

were free to leave, you felt that you were not.  You didn't believe that?

A    Not in the beginning, no.

Q    That was because I think basically there were so many agents there and the investigation was so big that you felt like they weren't going to let you leave?

A    Whatever is happening in this house is very important and I don't -- there's no reason for me to leave.

        MR. CHAPMAN:  Okay.  Nothing further.

        THE COURT:  Okay.  Thank you, Mr. Losado.  You may step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Uh-huh.

    We've probably got another 20 or 25 minutes.  Do you want to start with another witness?

        MS. CORBIN:  I plan to be pretty brief with Special Agent McCarthy because of all of the recording and things that came in with Special Agent Armstrong, so I potentially could be pretty quick.

        THE COURT:  Okay.  Why don't we go ahead and bring in Agent McCarthy then.

    For purposes of planning, it doesn't appear we're going to get done with all of the witnesses today.  I note that the trial is currently set for November 26th.  Are the parties believing that's a realistic date?  I'm just trying to figure

out with respect to a report and recommendation, objections. The Court actually -- Mr. Chapman, did you anticipate going to trial on the 26th?

MR. CHAPMAN:  I don't think it's realistic because we've asked for additional material about the computer software used by the government.  It hasn't been disclosed yet and I've --

THE COURT:  Okay.

MR. CHAPMAN:  -- retained an expert to look at that, so I don't think it's realistic.

THE COURT:  So --

MS. CORBIN:  I would actually -- we actually just disclosed that.  Maybe you haven't opened it yet, but we disclosed it on Monday, I believe, or Friday last week.

But that's still fine.  That seems pretty soon, so it would be fine to move that.

THE COURT:  So what I would anticipate doing, because of the Court's schedule, the only next available dates that I have for a significant block of time is going to be Monday, October 28th, or Wednesday, October 30th.  I could do it any time on those two days, but I'm assuming we're going to have to block at least a half day just kind of based on where we're going.

MS. CORBIN:  I'm sorry.  You said October 28th?

THE COURT:  October 28th or October 30th.  It's a

Monday or a Wednesday.

MR. ROSSI:  I hate to be that person, but I did not take my wife on a vacation, and we are going to be on a beach in Florida on those days.

THE COURT:  Okay.

MR. ROSSI:  So if I screw that up, I'm going to have much bigger problems than disappointing you, Your Honor, so --

THE COURT:  And when do you get back?

MR. ROSSI:  We will get back on the 30th.

THE COURT:  On the 30th.  Okay.  So what we'll try to do is look for dates in November.  And we can talk about that later.  I just thought while Agent McCarthy was out --

MS. CORBIN:  Okay.

THE COURT:  -- we could.  But we can go ahead and get started with Agent McCarthy and then we'll look for some November dates.

MS. CORBIN:  Okay.  Your Honor, the government calls Special Agent Robert McCarthy.

THE COURT:  And, Agent McCarthy, we're going to go ahead and swear you in.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you're about to give in this matter now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE CLERK:  Thank you, sir.  You may be seated.

THE WITNESS:  Thank you.

THE CLERK:  And as you are, please speak directly into the microphone and state your name for the record, please, spelling your last name.

THE WITNESS:  Yes.  My name is Robert McCarthy, and it's spelled M-C-C-A-R-T-H-Y.

THE COURT:  Thank you.

And, Ms. Corbin, anytime you're ready.

MS. CORBIN:  Thank you.

ROBERT McCARTHY, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. CORBIN:

Q    Agent McCarthy, can you tell us where you work.

A    I'm employed with Homeland Security Investigations here in Tucson, Arizona.

Q    How long have you been there?

A    Ten years.

Q    Okay.  And where have you worked and what duties have you had while you've been there?

A    I've worked in several areas.  Most recently, approximately the past five years has been assigned to a child exploitation unit.  I've worked both as a case agent and most recently also as a forensic agent.

Q    Okay.  And so how many child pornography cases and

investigations have you taken part in or been case agent on or done forensics on?  Just a ballpark.

A    With assisting in the various forms and the forensics, I would say, I would estimate it around 50.

Q    50 cases.  And do you recall where you were assigned in 2016?

A    To the Child Exploitation Group.

Q    In Tucson?

A    Correct.

Q    And are you familiar with the investigation of the defendant in this case, Kyle Edwards?

A    Yes.

Q    When do you recall getting onto that case?  Was that your case initially?

A    It was not.  My assignment initially was to be a part of a search team assisting with the execution of a search warrant.

Q    Okay.  And do you recall when that search warrant -- did you assist with that search warrant?

A    Yes, I did.

Q    And do you recall when it was?

A    I believe it was May 31st of 2016.

Q    Okay.  And do you happen to remember the address or anything that was familiar about the address?

A    If my memory is correct, I believe it was 7320 West Kiwi

Lane in Marana.

Q    If I said 7230 West Kiwi Lane --

A    That sounds correct, yes.

Q    Okay.  What was your duty that day when you were assisting with that search warrant?

A    I was initially assigned to assist with entry and also as a search team, but while on the inter -- or while on the search warrant location, I got called in to assist with an interview.

Q    Okay.  So what happened in that morning?  What was the first thing you did when you began the search warrant?  Did you meet up with the group first?

A    Yes.  We would have met up beforehand just to do a safety briefing.  Then we would have gone to the residence and the warrant would have been executed.

Q    Okay.  So the early meet-up, would that have been typical for the search warrants that you executed in the past?

A    Yes.

Q    And again, what time about would you have gone to the house and actually executed the warrant?

A    I believe the warrant was executed around 6:00 in the morning.

Q    And is that typical to execute the warrants that early?

A    They vary from case to case.

Q    Okay.  Why would you select to do it that early?

McCarthy – Direct

A    It could be any number of reasons.  A common reason would be just to try to execute the warrant in a time when you believe the residents will be home.

Q    Okay.  And at the beginning of the execution of the search warrant, where were you located?

A    In the very beginning I was outside, part of a group of agents that would be going in to do clearing of the residence.

Q    Did you approach the door with another agent initially to make initial connection with the occupants?

A    I did not.

Q    Where were you standing then while that was happening?

A    I don't recall the exact location, but usually we're, we're in the area.  We may be in a driveway.  We may be around a corner.

Q    Okay.

A    We may be a few feet away.

Q    All right.  And do you recall how many other agents or officers were with you that day?

A    In reviewing the report, I believe that there was approximately 18 people there.  However, not all of them are agents.  I believe we had a property officer who is not law enforcement and three forensic interns who were not law enforcement.

Q    Okay.  Again, is that typical for this type of warrant?

A    Again, it varies from place to place, but for this size

of residence, yes.  Just based on determining the number of agents needed, it's going to be two-factor:  One, what's needed to execute the warrant safely and then, secondly, what's needed to process the scene and do so in a manner so we're not there for an excessive period of time.

Q    To be efficient?

A    Correct.

Q    And do you know if before executing the warrant there was any information about there being multiple occupants in the house?

A    I believe it was briefed that there was two known occupants in the residence.

Q    Would that have affected how many people were ultimately -- how many agents were involved in the search warrant?

A    Yes.  We need to account for that both on the clearing of the residence and also when we're doing the processing for interviews and then who is going to be with someone in a nonsecured area if they choose to stay at the residence.

Q    Okay.  And then is there anything in particular about the types of things you're searching for in child exploitation cases that require manpower?

A    Yes.  They're very extensive searches.  It's not only just computers, which can be large.  It can also be very small items, such as micro SD cards and USB thumb drives.  Some of

them are disguised like other items, such as a key fob or something.  So it requires a thorough search, and usually there's multiple items that are seized at these warrants.

Q    Do you recall what you were wearing that day?

A    It would have been two things.  When I execute the warrants, I typically wear cargo pants and then a vest that marks me as being a police officer.  Once, once the warrant has been executed and the scene is safe, then I typically remove the vest and I'm wearing a T-shirt.

Q    Okay.  So when -- you said you ultimately took place in the defendant's interview that day?

A    Correct.

Q    Would you have been wearing your vest during the interview?

A    In this case, no, I was not.  I was just wearing a T-shirt.

Q    But you wore it at the initial part of the execution of the warrant when you assisted in clearing the house?

A    Correct.

Q    Okay.  So tell me, take me through the steps when -- what happened when you first made contact with the defendant at the house?

A    To clarify, are you speaking of when the warrant was executed?

Q    Yes.

A    Or during my first contact with the --

Q    No.  I'm sorry.  When the warrant was first executed.

A    I wasn't at the door, so I can't speak to that, but eventually we were told that the door had been answered and we were cleared to go in and clear the residence.

Q    Okay.  And at the time had -- were you told anything about weapons being in the house?

A    Yes.  We received information that there was supposed to be a second person inside the residence and that that person possessed firearms.

Q    Okay.  And does that change how you would clear the house?

A    Yes.  It's obviously going to make it a higher risk situation.  It doesn't mean that the weapons are going to be used, but it definitely puts us on alert, so we're going to proceed more cautiously.

Q    Okay.  And were you part of the group that ultimately found the other occupant in the house?

A    No.  I was search -- or clearing a different part of the room.  I could hear that somebody else had been contacted inside the residence, but I didn't see it and wasn't part of that.

Q    Did you eventually see the other occupant?

A    Eventually, yes.

Q    Where did you see him?

A      When I saw him, he was standing out on the back patio.

Q      Okay.  Was he handcuffed?

A      He was not.

Q      Okay.  Was there somebody outside with him?

A      Yes.

Q      And why would somebody be outside with him?

A      With the residence, it's an active search warrant scene. There's items of potential evidence located throughout.  And also with the report of there being firearms there, if somebody decides that they choose to stay at the residence, then they're going to have to be with someone just to make sure that they're not going for a weapon or trying to destroy any evidence while they're there.

Q      Okay.  And so after the house is cleared, what did you do next?

A      I would have gone outside to remove my vest and then waited while room labels are being put up and entry photographs are being taken.  Eventually, we would be notified that it's okay to proceed with the search.  I would have started a search, and then shortly thereafter I was contacted about assisting with the interview.

Q      Okay.  And so do you recall how you were contacted about assisting with the interview?

A      Yes.  Special Agent Katherine Gamble contacted me and said that the person being interviewed had requested that a

male participate in there in her place.

Q    Okay.

A    And she asked that I go in and assist.

Q    Okay.  I'm showing you -- where did the -- where did you ultimately go to participate in the interview?

A    It was in a bathroom/closet for -- I believe it was for the defendant's bedroom.

Q    Okay.  I'm going to show you what's been marked as Government's Exhibit 14.  Do you recognize that?

A    Yes.  That would be the bathroom.

Q    Okay.  And do you recall where everyone was sitting when you entered and started to participate in the interview?

A    Yes.  When I entered, the defendant, Mr. Edwards, was seated.  It would be to the left of where that photograph shows.  There was a bathtub.  He was sitting on the edge of it.

Q    Okay.

A    Agent Armstrong was the only other person in the room, and he was either sitting or leaning against the counter straight ahead.

Q    Here.  And where did you stand or sit?

A    I would have stood kind of right in that, right around where that towel rack is.  It appears to be a towel rack.

Q    Right here?

A    Yeah.

Q   Over, above the exhibit sticker?

A   Correct.

Q   Okay.  And during the entire part of the interview that you were involved, would you have been standing in that same place?

A   Correct.

Q   Okay.  Is that -- is that a cutout, an alcove?  What is that space?

A   To the right there, the immediate front right would be like a little toilet closet without a door, and to the back right would be a walk-in closet.

Q   Okay.  All right.  When you walked in, was the defendant handcuffed?

A   No.

Q   And did you start to participate in the interview?

A   Yes.

Q   Did you ask him questions?

A   Eventually.  At first I just observed.

Q   And when he answered questions, did he seem awake and coherent?

A   He did.

Q   And did he seem to understand what was being said to him?

A   He did.  In fact, when he didn't understand something, he would tell us:  I don't understand or I don't understand what you mean by that.  And several times he would ask clarifying

questions, asking us to either explain again or restate it.

Q    Okay.  At some point did he stop the interview?

A    Yes.

Q    Can you tell me a little bit about what happened with that.

A    At first he made a statement.  I believe it was something to the effect of:  I should probably get something like a lawyer.  That's not verbatim, but it's close.  It wasn't a clear request to me for an attorney, but it was something that Agent Armstrong and I decided to seek clarifying responses on, on how he wished to proceed.  Eventually, he gave a more definitive response of not wanting to speak further and the interview was ended.

Q    Okay.  So what happened after you ended the interview?

A    When it ended, Agent Armstrong packed up his items that he had with him.  He said he was going to go check on the status of the warrant, and then he left the room.

Q    Okay.  Do you recall if at that time -- do you recall at that time if the door of the bathroom was open, ajar, or do you remember what state it was in at that time?

A    I don't recall if it would have been partially closed. It would not have been closed all the way.

Q    Okay.

A    I believe it was open, but it's possible it could have been halfway.

Q    And so after Agent Armstrong left, what happened after that?

A    Well, to kind of back up, after he had made that initial comment mentioning a lawyer, while we were seeking clarification, he was making multiple statements about wanting help and not knowing how to proceed because he wanted to receive help.  I believe that his last statement while on the record was saying that he was worried about not getting help.

So after Agent Armstrong left, he was quiet for a while and then eventually he raised that again, saying that he was worried that he had made a mistake and that he wasn't going to get help.

So I told him that there were still counseling options available that he could use and recommended he check with his employer to see if they had an EAP program, told him that that would be a free counseling service that he could seek if he desired and if he did so that it would be confidential, they wouldn't release any information to us or his employer.  He then asked me if Agent Armstrong could come back into the room.

Q    Okay.  So stepping back, did you initiate the discussion about counseling and the availability of counseling or did he?

A    He initiated the discussion about wanting help.  I think during the interview we had told him:  You could seek counseling.  We may have initiated the mention of that word,

but during that portion where it was between the interviews, he initiated everything.

Q   Were you attempting to elicit more information from him about this investigation during that break?

A   I was not.  He seemed to be expressing a sincere desire to, that he wanted help with something, and I was just trying to provide him with a way that he could do that.

Q   Were you asking him any questions during that time?

A   I did not, no.

Q   Were you just providing him information that he was asking for?

A   I did.  I had no idea it was going to result in him asking for Agent Armstrong to come back in, and once he said that, I had no idea why he wanted Agent Armstrong to come back in or how it would proceed from there.

Q   Okay.  And so once he asked for Agent Armstrong to come back in, what did you do?

A   Agent Armstrong went back on the record and said:  I understood you want to speak with me.

Q   Step back.  How did you convey to Mr. Armstrong that he needed to come back in?

A   I asked another agent if they could get Agent Armstrong. They did.  They went and found him.  He came back in and then said:  Do you want to speak with me?  Mr. Edwards said, yes, he did.  And then Agent Armstrong took out the recorder and

then went back on the record.

Q    Okay.  Is there any reason that you didn't leave the room to go get Agent Armstrong?

A    He asked me if I could have Agent Armstrong return to the room.

Q    Okay.  Is there also -- is there any reason why you didn't leave him alone in the bathroom during that break after the first interview was ended?

A    Yes.  It goes back to, like I said earlier, that it's still an active search warrant scene.  We have items of potential evidence located throughout, the possibility of firearms.  Anyone who chooses to stay at the house is going to have to have somebody with them.

Q    Okay.  Did you tell him he couldn't leave?  Did you tell him he had to stay?

A    I did not.

Q    Okay.  So after Agent McCarthy came back -- I'm sorry.  After Agent Armstrong came back in, he turned back on the recording device?

A    Yes.

Q    And what happened after that?

A    Then he told him if he wished to proceed further in conversation that he would have to advise him of his Miranda warnings.  Before then, because my conversation with Mr. Edwards had occurred outside of the recording, I did a

summary of what that conversation was and asked Mr. Edwards if

he believed that was accurate to provide him with an

opportunity to either concur and say, yes, it was or to say,

no, I disagree with you, it was -- it happened differently.

Q    Did he say it happened differently?

A    No.  He said he agreed with my summary.

Q    Okay.  And did you hear Special Agent Armstrong read the

defendant his rights and waiver?

A    Yes.

Q    I'm going to show you what's been marked and admitted as

Government's Exhibit 7.  Do you recognize that?

A    Yes.

Q    Do you recognize this signature?

A    Yes.  That's my signature.

Q    Okay.  And this one?

A    That appears to be Agent Armstrong's signature.  I'm

familiar with the form and know that he signed above me.

Q    Okay.  And how about this signature?

A    It appears to read, "Kyle Edwards."  And again, I know

that Mr. Edwards had signed that form and that's where he

signed it.

Q    Okay.  And during the time in which this was signed and

the Miranda was read, did you believe that the defendant

understood his rights and what he was waiving?

A    Yes.  At first he was advised of the statement of rights

form, the top portion of that form.  Agent Armstrong asked if he understood, and he said he did.

Agent Armstrong then went over the waiver portion of it. Mr. Edwards appeared to be contemplating how he wanted to proceed, and we had a conversation with him just based on this is what it is.  If you want to talk to us, we have to have a waiver, but you don't have to talk to us.  So whatever, however you want to proceed, we want to proceed with how you're comfortable.  He eventually indicated that he wished to proceed and signed the waiver.

Q    Okay.  Do you see the statement here:  I was taken into custody at 0600 time?

A    Yes.

Q    Did you write that in?

A    No.  I believe Mr. Edwards wrote that in at -- I believe Agent Armstrong provided him with the time.

Q    Okay.  And is that true, that he was in custody at 6 a.m.?

A    No.  The form is an agency-wide form that has that as the language.  Agent Armstrong was reading the form verbatim and that's what's on there, but I believe if you listen to the audio recording he makes a correction to it, stating something to the effect of, you're not in custody, you were detained at 600, to point out that that doesn't apply.  However, that's what the form reads.

Q    Okay.  Do you typically use these forms in other cases as well?

A    That's our standard form.

Q    And so that is the one that you use?

A    Correct.

Q    Is this -- okay.

A    It may get updated from time to time with the agency logo, but that portion of it remains the same.

Q    Okay.  So after the signature, did the interview continue?

A    It did.

Q    And then ultimately did it end?

A    It did.

Q    And who ended it?

A    Again Mr. Edwards.

Q    Okay.  And when he -- do you recall what he said to end it?

A    I believe he said:  I'm done.  He indicated that he didn't want to speak to us anymore.

Q    And did you guys ask him any more questions after that?

A    No.  We stopped.

Q    Okay.  And so what happened after that?

A    I believe Mr. Edwards left shortly after that.  I would have been in the bathroom a short time later and then eventually went back to a search team.

Q    Okay.  And then do you recall how much longer you were at the house to complete the search warrant?

A    I don't recall, no.

Q    A couple of hours?

A    I don't recall.

Q    Okay.  And throughout the time that you were part of the interview with the defendant, Mr. Edwards, was he -- did you ever threaten him?

A    No.

Q    Did you promise him anything?

A    No.

Q    Did you try to deceive him?

A    No.

Q    Did you prevent him from going to the bathroom or getting a drink of water or anything he asked for like that?

A    No.  He never made a request to use the restroom.  He was drinking water that he had in there when I entered into the interview.

Q    And what was his demeanor like?

A    He was very calm.  He was polite.  He seemed shaken up. During the second portion of the interview, he cried at times.

Q    Okay.  After the execution of the search warrant and your activities that day, did you do anything to memorialize your duties and your acts, your job that day?

A    No.

Q    Okay.  And is that normal?

A    Yes.  When an interview is audio or video-recorded, the recording serves as the official record of that interview, and then it's common for one of the agents, the primary agent, to make a report summarizing it, which would have been Agent Armstrong.

MS. CORBIN:  Okay.  Your Honor, could I have a moment?

THE COURT:  Sure.

MS. CORBIN:  Okay.  I have nothing further.

THE COURT:  Okay.  Thank you.

Mr. Chapman, I would be inclined just to continue it at this point if you're -- if you don't have an objection to that.

MR. CHAPMAN:  That's fine, Judge.

THE COURT:  I think by the time we get to cross, we're not going to get to rebuttal anyway.

MR. CHAPMAN:  Right.

THE COURT:  Okay.  So, Agent Armstrong, you're done for the day, but we're going to have you come back, and if you would like to just stay in the back of the courtroom, we can talk about new dates.

During the course of the rest of the afternoon, I was told by chambers that the afternoon of October 15th has just opened up.  I don't know if that works for everybody.

THE WITNESS:  May I be excused from here, Your Honor?

THE COURT:  Sure, sure.  And like I said, if you want to just remain here just in case that date doesn't work for you.  You would be the first one up, most likely.

THE WITNESS:  Yes, Your Honor.

THE COURT:  So --

MR. CHAPMAN:  That's fine on my calendar.

THE COURT:  Okay.  Ms. Corbin and Mr. Rossi, does that work for you?

MS. CORBIN:  We're checking with the agent right now.

THE COURT:  Oh, okay.

And, Mr. Chapman, I'm assuming that works for Mr. Edwards as well?

MR. CHAPMAN:  Yes.  He can get time off.

MS. CORBIN:  It looks like Special Agent McCarthy will actually be away that whole week.

THE COURT:  Oh, all right.  I think the next date was October 31st, at 10:00.

And how much, how much time do we have there, Cindy? Would it just be two hours?

THE CLERK:  The rest of the day.

THE COURT:  Oh, okay.  So October 31st we could start at 10:00 and go as long as you need.

MR. CHAPMAN:  Could we go -- could we start in the afternoon?  Because I have something in the morning.

THE COURT:  Yeah, we could probably do that.  Would October 31st --

MS. CORBIN:  I think so far.  Let's check with --

THE COURT:  Okay.  You can bring him in, Mr. Rossi, if you want, just in case we've got to look for some other dates.

So if we did, you're thinking maybe 1:30?

MR. CHAPMAN:  Yeah.

THE COURT:  And how much time do you guys think you have left?

MS. CORBIN:  I, I -- we have no more witnesses unless we need to --

THE COURT:  Okay.

MS. CORBIN:  No, I don't think.  I mean, if you don't have any --

MR. CHAPMAN:  We should be done that afternoon.

THE COURT:  Okay.  So October 31st, at 1:30, does that --

MS. CORBIN:  Does that work, Jeff?

Yes, I think that works.

THE COURT:  That works for everybody.  Okay.  So we will continue the hearing for October 31st, at 1:30 p.m.

And then, Ms. Corbin, you said so we'll have Agent McCarthy's cross and redirect and then the government's done?

MS. CORBIN:  Yes.

THE COURT:  And then, Mr. Chapman, I'm assuming Mr. Edwards will testify?

MR. CHAPMAN:  Yes.

THE COURT:  And then we'll do argument.  So okay. All right.

MS. CORBIN:  Thank you.

MR. CHAPMAN:  Thank you.

THE COURT:  We will see you back on the 31st.

MS. CORBIN:  Okay.

(Court recessed at 4:49 p.m.)

C E R T I F I C A T E


        I, Aaron H. LaDuke, court-approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter to the best of my ability.

        Dated this 11th day of October, 2019.


                        _____s/Aaron H. LaDuke_____
                        Aaron H. LaDuke, RMR, CRR