# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00184-TUC-JGZ (LCK) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Kyle Richard Edwards, | |
| Defendant. | |

Pending before the Court is Defendant's Motion to Suppress Statements. (Doc. 19.) The government filed a response. (Doc. 28.) This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 57.6. Evidence and argument were heard on October 3, 2019, and November 7, 2019. (Docs. 41, 51.) This matter was submitted following oral argument at the conclusion of the hearing.

Defendant alleges that his right to a *Miranda* warning was violated with respect to his first statement, and his second statement and related *Miranda* waiver were involuntary; therefore, he argues both statements should be suppressed. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion to suppress.

## I. FACTS

Defendant Kyle Edwards is charged with distribution of child pornography and knowing access with intent to view child pornography. (Doc. 1.) Homeland Security Investigations Special Agent (SA) Jeffrey Armstrong learned that fifteen files that qualified

as child pornography had been downloaded by an IP address associated with Defendant. (RT 10/3/19 at 8.)[1]

SA Armstrong obtained a search warrant for Defendant's home, which was executed on May 31, 2016. (*Id.* at 10; Ex. 9.)[2] Federal agents were accompanied by local law enforcement wearing uniforms, tactical vests, and driving a marked patrol vehicle with lights activated. (RT 10/3/19 at 11-12, 56, 57.) Just as the warrant became valid at 6 a.m., SA Armstrong approached Defendant's home with a Marana police officer and rang the doorbell twice. (*Id.* at 11, 12, 18.) There were between twelve and fifteen armed agents (plus four non-agents) present for execution for the warrant, and they arrived in approximately ten vehicles. (*Id.* at 17, 56, 61, 113.) They brought as many agents as possible to streamline the intensive search. (*Id.* at 17-18, 114-15.)

Defendant was startled awake by load pounding, and he answered the front door. (RT 11/7/19 at 19.) He was wearing only boxer briefs. (*Id.* at 19-20.) SA Armstrong spoke with Defendant, who he remembered as wearing solely a pair of shorts, and informed him they had a warrant to search. (RT 10/3/19 at 20, 64, 87.) SA Armstrong detained Defendant and escorted him to the driveway while his roommate was located. (*Id.* at 21, 63; RT 11/7/19 at 20.) The "entry team" had their weapons drawn as they approached the house, but SA Armstrong's weapon was holstered. (RT 10/3/19 at 20, 22.) Defendant saw a battering ram, about ten agents in full tactical gear including guns, and five or six police vehicles blocking the driveway. (RT 11/7/19 at 20, 21, 22.) Defendant felt terrified. (*Id.* at 21.) Four agents entered to find Defendant's roommate, Justin Losado. (*Id.*)

Losado testified he was awoken by armed agents at his bedroom door and told to get on the floor. (RT 10/3/19 at 98-99.) Losado recalled being kept on the living room couch in handcuffs for 20-40 minutes. (*Id.* at 99, 100, 102.) Subsequently, agents removed the handcuffs, he put on pants, and an agent took him to the back patio. (*Id.* at 23-25, 64,

---

[1] "RT" refers to the Reporter's Transcripts of the evidentiary hearing, which the Court refers to by date. (Docs. 44, 58.)

[2] The cited exhibits were provided by the government and admitted at the hearing. The government's exhibits duplicated all Defendant's exhibits upon which the Court relies. (Docs. 54, 55.)

101.) SA Armstrong testified that Losado was briefly handcuffed and detained but was not under arrest and was free to leave. (*Id.* at 23, 24, 81-82.) Losado recalled being on the patio for a few hours (*id.* at 104), but his interview began at 7:38 a.m. (Ex. 15). Losado saw around 20 agents in the home wearing tactical gear and weapons. (RT 10/3/19 at 100, 102-03.) He was told before and during his interview that he was not under arrest and he was free to leave. (*Id.* at 105-06.) However, he did not believe he could leave while the agents were conducting their business. (*Id.* at 103, 107.) Once his interview was completed, Losado testified the atmosphere was more relaxed. (*Id.* at 106.) He had no contact with Defendant during this time period. (*Id.* at 103; RT 11/7/19 at 23.)

SA Armstrong intentionally separated the occupants so they could not influence one another. (RT 10/3/19 at 26.) Defendant was not left alone in his home while the warrant was being executed. (*Id.* at 65.) SA Robert McCarthy testified that, if a suspect is present at an unsecured search warrant scene, an agent will remain with him; he cannot roam around freely. (*Id.* at 117; RT 11/7/19 at 6-8, 11.) Defendant was never handcuffed. (RT 10/3/19 at 33, 82.)

After being on the driveway, Defendant testified he was herded under escort to the master bathroom, passing Losado in handcuffs. (RT 11/7/19 at 23, 25.) SA Armstrong testified that the bathroom was chosen to provide privacy during the interview. (RT 10/3/19 at 35.) Defendant testified he was seated on the floor, while SAs Armstrong and McCarthy testified that Defendant sat on the edge of the tub. (*Id.* at 31, 118; RT 11/7/19 at 24.) SA Armstrong was leaning against the counter, and Defendant testified that the door to the six foot-by-six-foot room was essentially blocked by agents. (RT 10/3/19 at 31; RT 11/7/19 at 25, 27.) SA Katherine Gamble also was present. (Ex. 2 at 2.) Defendant remained in only his boxer shorts because no one offered for him to get dressed. (RT 10/3/19 at 65-66; RT 11/7/19 at 23, 26.) Defendant could hear a lot of activity happening outside the bathroom, but it was quiet inside the room. (RT 11/7/19 at 39-40.) Agents conducted Defendant's interview in two parts, with a short break in-between.

Prior to turning on the recording, SA Armstrong informed Defendant that he was free to leave and not under arrest. (RT 10/3/19 at 92-93.) The first recorded interview lasted

just over thirty minutes, ending at 6:43 a.m. (*Id.* at 44; Ex. 2 at 43.) Defendant was not informed of *Miranda* rights prior to questioning. (Ex. 2.) The agents testified that Defendant was coherent, did not appear confused, and did not appear to be under the influence of any substances. (RT 10/3/19 at 26-27, 119.) SA Armstrong asked him biographical questions, his phone number and email, occupation (HVAC technician), criminal history (essentially none), and education (completed 11th grade); Defendant coherently answered the questions. (Ex. 2 at 2-8.) The agent then told Defendant he had information about a child molestation complaint connected to that house (based on some of the images he had reviewed); Defendant denied involvement as to that charge. (*Id.* at 9-10; RT 10/3/19 at 37; RT 11/7/19 at 26.) The agent did not and does not have evidence that Defendant was suspected of molestation. (RT 10/3/19 at 59-60, 69.)

Defendant was offered and accepted a glass of water. (Ex. 2 at 10-11.) SA Armstrong told Defendant that he was not under arrest and was free to leave, and "the door's open." (*Id.* at 11-12; RT 10/3/19 at 39-40.) Defendant stated that he understood he was not under arrest and acknowledged that he did not feel he was being held, and he agreed to talk to the agents. (Ex. 2 at 12-13.) At the suppression hearing, Defendant testified that this response may have been provided without his full understanding. (RT 11/7/19 at 43.) Defendant answered several questions about his internet account and computer. (Ex. 2 at 18-21.) When SA Gamble asked how Defendant used his laptop, Defendant asked if she could be replaced with a male agent. (*Id.* at 21.) SA Gamble left and was replaced by SA McCarthy, who testified that he was not wearing a tactical vest. (RT 10/3/19 at 115.) Defendant testified that the door was closed after SA Gamble left the room and was not left open until he was released to go; audio reflects the door closing at that time. (Ex. 1; RT 11/7/19 at 32.)

Defendant told the agents that he used his laptop to look at pornography, and the agents asked him numerous questions about his searches, the material he looked at, and the computer used. (Ex. 2 at 22-33.) When SA Armstrong asked about Defendant's phone, Defendant asked if he could text his boss to let him know he would be late. (*Id.* at 34.) SA Armstrong acknowledged Defendant needed to get to work and stated, "in just a minute"

- 4 -

and "we'll probably be done shortly." (*Id.*) Defendant was in possession of his boss's keys and he was concerned and embarrassed that his boss might show up while the police were present. (RT 11/7/19 at 28-29.) Defendant's work phone was part of the search warrant (Ex. 9); SA Armstrong was concerned that, if given access, Defendant could have tried to destroy evidence on the phone. (RT 10/3/19 at 73, 89; RT 11/7/19 at 13-14.)

SA McCarthy informed Defendant they were investigating child pornography and Defendant stated, "[t]hat's what I assumed from what he was saying earlier." (Ex. 2 at 36.) Defendant explained, at the hearing, that he made that connection due to the questions about the internet. (RT 11/7/19 at 50, 52.) Defendant admitted that some child pornography "just kind of came up" during an internet search. (Ex. 2 at 36.) When agents informed him that the law enforcement search would reveal what Defendant had looked for online, he said, "I know I should probably get a – like a lawyer or something." (*Id.* at 39.) Defendant went on to state that he needed help, that he didn't think it was right and did not like it, and it's not who he is. (*Id.*) SA Armstrong attempted to clarify if Defendant was requesting a lawyer or wanted to continue speaking with them and reminded him that he was not under arrest, was free to leave, and could go to work. (*Id.* at 40-41.) SA McCarthy stated, "You wanna take a break we take a break. You wanna be done be done. You wanna talk we'll talk." (*Id.* at 41.) When SA Armstrong asked what Defendant meant when he mentioned an attorney, Defendant stated that he didn't know if he needed an attorney, and then stated that he should probably have one. (*Id.* at 42.) The agent ended the interview. (*Id.*) At that time, SA Armstrong believes he told Defendant he was free to leave but that is not included in his report. (RT 10/3/19 at 94-95.) SA Armstrong left the room to check on the status of the search warrant. (*Id.* at 120.)

SA McCarthy remained in the room with Defendant. He testified that the door was at least part way open at that time, but Defendant stated that the door remained closed. (*Id.* at 77, 120; RT 11/7/19 at 32.) Defendant testified that he stood to leave but was told he would have to wait. (RT 11/7/19 at 33-34, 59.) SA McCarthy testified that he did not inform Defendant that he was free to go; however, Defendant did not ask or try to leave. (*Id.* at 9, 11, 15, 76-77.) Defendant initiated a conversation about wanting help, and SA McCarthy

talked to him about options such as an EAP program through work. (Ex. 3 at 3; RT 10/3/19 at 121-22.) SA McCarthy did not initiate any conversation and the only discussion was about counseling. (RT 10/3/19 at 122; RT 11/7/19 at 9-10.) Defendant testified he was crying during this break and throughout both interviews. (RT 11/7/19 at 34, 65-66.) SA McCarthy did not witness Defendant crying during the first interview or the seven-minute break. (*Id.* at 75-76.) After several minutes, Defendant asked SA McCarthy to have SA Armstrong return. (Ex. 3 at 3; RT 10/3/19 at 121, 122.)

SA Armstrong returned to the bathroom seven minutes after the first interview was terminated. (RT 10/3/19 at 44-45.) SA Armstrong informed Defendant he was not under arrest and could go to work. (Ex. 3 at 2.) Defendant felt like he had no choice but to give a statement because when he had asked for a lawyer and tried to leave, he had been stopped. (RT 11/7/19 at 35, 58-61.) SA Armstrong informed Defendant he would have to complete a *Miranda* waiver if he wanted to reinitiate an interview without an attorney. (Ex. 3 at 2.) Defendant stated, "so-yeah you concluded, um, I don't need a lawyer." (*Id.* at 3.) SA Armstrong responded, "you're telling me that, right?"; Defendant answered, yes. (*Id.*) Defendant testified that he believed the agents made the choice that he did not need a lawyer because he requested one during the first interview and he wasn't allowed to leave. (RT 11/7/19 at 36, 62.) SA McCarthy stated for the second recording that, during the break, Defendant expressed concern that he would not get help and the agent suggested contacting the EAP program at work. (Ex. 3 at 3; RT 10/3/19 at 123-24.) SA McCarthy noted that Defendant asked to have SA Armstrong return, and Defendant confirmed those statements as an accurate summary of what had occurred during the unrecorded period. (Ex. 3 at 3; RT 10/3/19 at 123-24.)

SA Armstrong read Defendant a Statement of Rights, and Defendant stated that he understood and did not need to look at the form. (RT 10/3/19 at 47; Ex. 3 at 4.) SA Armstrong then read Defendant the waiver portion of the form. (Ex. 3 at 4-5.) The standard form uses the language "taken into custody." (Ex. 7.) SA Armstrong changed the language to state that Defendant was detained at 6 a.m. that morning, and he testified that Defendant

was briefly detained at the time the agents initially entered the house. (Ex. 3 at 5; RT 10/3/19 at 48, 82-83, 125.)

Defendant then initiated the following discussion:

Mr. Edwards: Does this mean I can never get a lawyer?

S.A. Armstrong: No, no, no, no, not at all. Not at all.

Mr. Edwards: Just right now. Just –

S.A. Armstrong: You – you can get one right now if you want.

Mr. Edwards: Just right now –

S.A. Armstrong: This is just a –

Mr. Edwards: It just means I can talk to you without a lawyer present; right?

S.A. Armstrong: Right. We need your permission to do so. And this form gives us the permission to – to resume our interview. That's all that form does.

. . . .

S.A. McCarthy: With that, Kyle, it's like he said, to answer your question, it doesn't waive your rights to get an attorney at any point. It's just because you asked for one, we can't discuss further, even if it's –

Mr. Edwards:  Well, does this really help you guys out?

S.A. McCarthy: We're not looking to help us out. Just if you want to talk and tell us what's going on, then we're here to listen, and we can – but for us to like engage in that conversation, we have to have this.

S.A. Armstrong: Right.

S.A. McCarthy: But you can get a lawyer later. You can have a lawyer now. You can get two questions into our further talks and change your mind. I mean, it's whatever you're comfortable with. I mean because you . . . You called – you called him back in here. So, it's just whatever you want to do. But we can't – we can't proceed further without it, but we don't have to proceed further either. So . . .

(Ex. 3 at 5-7.) Defendant then signed the waiver form. (*Id.* at 8; Ex. 7.) The agents perceived that Defendant understood the rights and what he was waiving. (RT 10/3/19 at 48-49, 124-25.) Defendant testified that he didn't really listen to the *Miranda* waiver because he had been denied a lawyer already. (RT 11/7/19 at 62.) Defendant acknowledged

that the agents told him he could get a lawyer; however, Defendant did not believe them because his first request for counsel had been denied. (*Id.*)

Upon questioning, Defendant made several incriminating statements. (Ex. 3 at 8-15.) About ten minutes into the recording, Defendant began crying, which is audible on the recording. (Ex. 1; RT 10/3/19 at 52-53, 127.) Defendant stood up only one time, to get a tissue. (RT 11/7/19 at 11.) Defendant asked to text work before his phone was taken. (Ex. 3 at 12-13.) The agents agreed they would let him text work and get numbers off his phone, and SA McCarthy stated that he would ask to have Defendant's phone prioritized for return to him. (*Id.* at 13.) After providing a few more incriminating answers, Defendant stated that he did not want to talk anymore, and the agents terminated the second interview. (*Id.* at 14-15; RT 10/3/19 at 51.) Defendant testified that he felt he could end the interview because he had given the agents what they wanted. (RT 11/7/19 at 63, 68.) The second interview lasted from 6:50 to 7:07 a.m. (Ex. 3 at 2, 16.) Both agents testified that they did not promise Defendant anything or threaten him (RT 10/3/19 at 52, 127); Defendant provided no contradictory testimony.

SA Armstrong allowed Defendant to get numbers from his phone and Defendant left for work. (*Id.* at 51-52; RT 11/7/19 at 13, 39.) When Defendant left, agents were still conducting the search. (RT 10/3/19 at 53.)

At the suppression hearing, Defendant testified that agents told him where to go, and he was always under escort. (RT 11/7/19 at 32.) He did not believe the statements that he was free to go due to his confinement, the fact that there were so many agents in the house, he was sitting on the floor of the bathroom being interrogated by two agents blocking the door, agents twice denied his request to contact his boss, he remained in his underwear throughout the interviews with no offer to get dressed, and his vehicle was blocked-in by law enforcement. (*Id.* at 27, 32-33, 66-67, 72-73.)

## II. DISCUSSION

### First Statement, *Miranda*

Defendant argues that he was in custody at the time of the first statement and his rights were violated by the absence of a *Miranda* warning. The Government is precluded from using statements arising from custodial interrogation absent the provision of warnings regarding the person's rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (defining in custody to encompass when a person has been "deprived of his freedom of action in any significant way."). The government conceded Defendant did not receive *Miranda* warnings prior to making the first statement. However, the government asserts Defendant was not in custody at that time.[3] When deciding whether a person was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The Court must look at the totality of the circumstances and decide whether a reasonable person would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

In-home interrogations are less likely to be custodial because the familiar surroundings of the location tend to decrease the element of compulsion. *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008). However, when the circumstances turn the comfort of home into a police-dominated atmosphere, it becomes custodial in nature. *Id.* "The determination of whether an in-home interrogation was custodial 'is necessarily

---

[3] Defendant disputes the government's position because, during the second interview, SA Armstrong stated on the *Miranda* waiver form that Defendant had been in custody since 6 a.m. The agent explained to Defendant (and at the hearing) that he had been detained (not taken into custody) at 6 a.m., and the language was merely because of the use of a standardized form. (Ex. 3 at 5; RT 10/3/19 at 48, 82-83, 125.) Regardless, an agent's subjective belief is not relevant to this Court's analysis. *See Stansbury v. California*, 511 U.S. 318, 323 (1994). During the initial interview, SA Armstrong stated more than once that Defendant was not under arrest; he never communicated that Defendant was detained or in custody or would be arrested at any point that day. *See id.* at 323-24 (explaining that an officer's uncommunicated intent is not relevant to evaluating how a reasonable person would have understood the situation).

fact intensive.'" *Id.* at 1084 (quoting *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)). The Ninth Circuit has highlighted four factors of significance in assessing whether the person was in a police-dominated atmosphere:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was free to leave or terminate the interview, and the context in which any such statements were made.

*Id.*

Here, Defendant saw at least ten agents (more were present) that were armed, several initially with their weapons drawn. This is strong evidence to suggest Defendant was in a police-dominated atmosphere. *Id.* at 1085. However, no weapons were drawn on Defendant. After the clearing of the house, Defendant was taken to the bathroom, out of the presence of all but two agents at a time. The space, however, was small and Defendant testified there was an agent essentially between him and the door. There was no testimony about the presence of weapons in the bathroom. The fact that Defendant was kept isolated from his roommate and not allowed to move about the house without an agent also suggests he was in custody.

No force was used against Defendant; he was neither handcuffed nor threatened. Although Defendant was not fully dressed, he was wearing boxer brief underwear that appeared to SA Armstrong as equivalent to a pair of shorts. Defendant acknowledged that the bathroom was quiet compared to the activity going on in the other parts of the house. The recording of the interview reveals that the agents did not raise their voices and remained calm; no coercive statements were made during the interview. Defendant contends that SA Armstrong's statement that he was investigating child molestation was coercive and designed to elicit incriminating statements from him. The Court disagrees because Defendant was informed, and acknowledged, that the investigation was about child pornography prior to him making any incriminating statements.

Defendant was told repeatedly that he could terminate the questioning and that he was free to leave. Although Defendant testified (several years later) that he did not believe he was free to leave, he acknowledged during questioning that he understood he was not being held and could leave. "If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody." *Craighead*, 539 F.3d at 1087 (citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). Defendant asked for the female agent to leave the room, he requested the ability to contact work, and he terminated the interview after approximately 30 minutes. Although he was not granted the right to contact work immediately, Defendant's requests suggest the atmosphere was not so police-dominated that a reasonable person would have been unable to assert their desire to leave. When Defendant raised the possibility of getting an attorney, the agents again told him he was not under arrest and could go to work, take a break, or continue talking. Faced with those choices, Defendant chose to stop talking and the agents asked no further questions at that time. The first interview was not lengthy, lasting approximately thirty minutes.

In *Craighead*, the defendant testified that he doubted the agent's statement that he could leave because multiple law enforcement agencies were present and might not all agree with that statement. Further, the defendant did not want to leave his home while the search was ongoing. These facts are distinguishable from the present case. Defendant expressed no awareness that more than one law enforcement agency was participating in the search of his home and might object to his departure. More critically, Defendant indicated to the agents that he was late for work and, upon leaving the interview, would be going to work. In fact, when he ended the second interview, agents moved their vehicles out of his way, and he left the house to go to work. *See United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) ("Being aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the questioning was

noncustodial."). Although Defendant could not "leave" the interview and be in his home unaccompanied, he could leave his home to follow-through on his intent to go to work.

Looking at the totality of the circumstances, the Court finds Defendant was not in a police-dominated atmosphere such that he was in custody. Defendant's isolation and the large number of agents support his argument that he was in custody. However, the Court finds the agents' repeated statements that Defendant was free to leave to be the weightiest factor in the equation. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (recognizing that all questioning by law enforcement "will have coercive aspects to it"). In addition to informing Defendant that he was not under arrest, SA Armstrong sought and received verbal confirmation from Defendant that he was not being held and was not under arrest. Although Defendant testified that he may not have understood to what he was agreeing, Defendant's answers before and after were coherent and responsive. Defendant's decision to terminate the interview reinforces the fact that he did not feel compelled to participate. His physical person was never restrained. A reasonable person in this situation would have felt free to leave. Because Defendant was not deprived of his freedom in any significant way while he was in the bathroom, he was not in custody. Therefore, his *Miranda* rights had not attached, and his statement is admissible.

**Voluntariness**

Defendant contends that his statements were involuntary, relying primarily on what he characterizes as the police-dominated atmosphere.[4] The test for determining the voluntariness of a suspect's confession is whether, considering all the circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)). The circumstances to be considered include: (1) whether there was police coercion; (2) the

---

[4] Defendant did not argue directly that his first statement was involuntary. (*See* Doc. 19; RT 11/7/19 at 80-85, 94-95.) However, the Court addresses the voluntariness of Defendant's first statement because it is implicitly raised by Defendant's argument that his second statement was involuntary based (in part) on the taint of the first statement.

length of the interrogation, its location and its continuity; (3) whether police advised the suspect of his rights; and (4) whether there were any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Courts also consider the defendant's age, education, the nature of any questioning, and the use of any physical punishment such as the deprivation of food or sleep to determine voluntariness. *See United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). A statement will be found involuntary if agents "use coercive means to undermine the suspect's ability to exercise his free will." *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Coercive action by the police is a prerequisite to finding that a statement is involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "In short the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes*, 373 U.S. at 513-14.

The Court has read the transcripts and reviewed the audio recordings of both interviews. (Exs. 1-3.) Although Defendant was not given a *Miranda* warning prior to the first statement, the Court determined it was not required because he was not in custody. Defendant was given a *Miranda* warning prior to his second statement. Additionally, Defendant was notified before and during the first interview, and before the second interview, that he was not under arrest and was free to leave his home and go to work. Defendant testified that he did not believe he was free to go because he attempted to leave during the break and was told he had to wait. But, when SA Armstrong returned, he informed Defendant, again, that he was free to leave and go to work. (Ex. 3 at 2.) At that point, Defendant did not indicate that he wanted to leave. (*Id.*) Shortly thereafter, when SA McCarthy summarized what happened during the unrecorded break period, Defendant agreed with his summary, which did not include a request by Defendant to leave. (Ex. 3 at 3.) Defendant stated that he understood his rights when they were read to him, which included the right to remain silent and to counsel. (*Id.* at 4; Ex. 7.) SA McCarthy stated with clarity that Defendant need not "help" the agents by talking and the choice to talk was

- 13 -

his. To the extent he had questions about his right to counsel, Defendant asked questions and did not sign the waiver until they were answered. The record establishes that Defendant was fully informed of his rights and understood them prior to making any statements.

The first interview lasted approximately 30 minutes and the second lasted for seventeen minutes; including the intervening break, the whole process was less than one hour. Defendant had no experience with the criminal justice system and had not graduated from high school. However, he was 31 years old, had been working for the same employer for more than four years, owned a car, and rented a home. (Ex. 2 at 2-3, 5-6.) His circumstances suggest he was a relatively stable adult and not a particularly vulnerable person. Defendant was offered water during the first interview and he was never physically restrained. Defendant was coherent and responded appropriately to the questioning. Defendant felt comfortable in asking the female agent to leave the room, requesting the ability to contact work, and terminating the first and second interview. Although Defendant was not granted the right to contact work immediately, his requests indicate his will was not overcome by the agents' conduct.

As discussed above, the agents' tone remained calm and neutral and neither agent was aggressive or confrontational. SA Armstrong noted in the second interview that he appreciated Defendant treating them with respect and they had responded in kind. (Ex. 3 at 7-8.) There was nothing coercive in the way the agents spoke to Defendant. The agents did not threaten Defendant, promise him anything, or induce him with a benefit of any kind. As discussed above, the agents clarified that they were investigating child pornography (not child molestation) prior to Defendant making incriminating statements. Therefore, the initial misleading information provided to Defendant was corrected and not coercive. The Court concluded that Defendant was not subjected to a police-dominated atmosphere. And, close review of the transcripts and recordings do not suggest the agents' actions were coercive and that Defendant's will was overborne. After reviewing the totality of the circumstances, the Court finds that Defendant's statements were voluntary.

Defendant's argument regarding the voluntariness of his second statement is premised primarily on his contention that the first statement was obtained without a required *Miranda* warning and was involuntary. This argument fails because Defendant's statements were non-custodial; therefore, no *Miranda* waiver was required for the first statement. Further, because the first statement was voluntary and not coerced, it has no bearing on the admissibility of Defendant's second statement. *See Oregon v. Elstad*, 470 U.S. 298, 313 (1985).

**Second Statement, *Miranda* waiver**

Defendant argues that his *Miranda* waiver was not valid because it was coerced by the agents. In disputing the validity of his waiver, Defendant also relies upon the length of time between the reading of his rights and his signing of the waiver; the fact that his questions suggest he did not understand the waiver; and that the agent did not obtain a verbal acknowledgment from Defendant as to the waiver. For incriminating statements obtained during a custodial interrogation to be admissible, any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). There is a presumption against waiver, and the Government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Connelly*, 479 U.S. at 168; *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).

First, the Court finds the lack of a verbal acknowledgement from Defendant that he wished to waive his rights insignificant considering his signing of the form. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (finding that silence is insufficient for a waiver, but a written or oral statement of waiver is strong proof of its validity). SA Armstrong read the form to Defendant and he was given the opportunity to review it himself before he signed it. (Ex. 2 at 3-5; Ex. 7.)

Next, Defendant argues that his *Miranda* waiver was not voluntary because it was coerced by the agents. The standard for determining the voluntariness of a statement, cited in the above section, is the same as the standard for the voluntariness of a *Miranda* waiver. *See Connelly*, 479 U.S. at 169; *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (holding a

waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception"). For the reasons stated above, with respect to the voluntariness of Defendant's statements, the Court finds Defendant's waiver of his *Miranda* rights was voluntary.

Finally, Defendant argues that the lengthy colloquy between him and the agents and his questions indicate he did not understand the rights he was waiving. A waiver is knowing and intelligent if, under the totality of the circumstances, it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421 (1986); *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citations and quotations omitted). After the initial reading, Defendant stated that he understood his rights. (Ex. 3 at 4.) Because Defendant asked questions about how the waiver would impact his right to get an attorney at that time or in the future, the discussion lasted just over five minutes. (Ex. 1.) During that time, the agents provided accurate information that the waiver did not preclude Defendant from changing his mind and requesting an attorney at any point in time after he signed it. (Ex. 3 at 5-7.) Defendant stated his understanding that signing the form meant only that he could talk to them right then without a lawyer present (not that he was precluded from ever having an attorney). (*Id.* at 5-6.) The record indicates that Defendant asked clarifying questions and verbalized an understanding of his rights. Considering the totality of the circumstances, the evidence presented establishes that Defendant knew and understood his *Miranda* rights, and knowingly and intelligently waived them.

Having considered the above factors, along with the testimony and evidence, the court finds that the government has met its burden of proving a voluntary, knowing and intelligent waiver of *Miranda* rights.

## III. RECOMMENDATION

It is recommended that, after its independent review of the record, the District Court deny Defendant's Motion to Suppress Statements. (Doc. 19).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the district court. If objections are not timely filed, they may be deemed waived.

Dated this 26th day of November, 2019.

_Lynnette C. Kimmins_

Honorable Lynnette C. Kimmins
United States Magistrate Judge