**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00184-001-TUC-JGZ (LCK) |
| Plaintiff, | **ORDER** |
| v. | |
| Kyle Richard Edwards, | |
| Defendant. | |

Defendant filed a Motion to Suppress Statements made to law enforcement officers. Before the Court is Magistrate Judge Lynette Kimmins' Report and Recommendation (R&R) recommending that the District Court deny Defendant's Motion. Defendant has filed an objection. After an independent review of the parties' briefing and of the record, the Court concludes that Defendant was subjected to a custodial interrogation, but that after terminating the first interview, Defendant voluntarily re-engaged with law enforcement and waived his *Miranda* rights. The Court will therefore adopt Judge Kimmins' recommendation to deny Defendant's Motion to Suppress Statements in part, suppressing statements made in the first interview, but allowing all statements given after the *Miranda* warnings.

## STANDARD OF REVIEW

When reviewing a Magistrate Judge's Report and Recommendation, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review

the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis omitted). District courts are not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn,* 474 U.S. 140, 149 (1985). *See also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Reyna-Tapia,* 328 F.3d at 1121; *Schmidt v. Johnstone,* 263 F. Supp. 2d 1219, 1226 (D. Ariz. 2003).

## DISCUSSION

### I. Background

The following facts are adopted from the R&R and reproduced here, with only slight addition or modification. Defendant Kyle Edwards is charged with distribution of child pornography and knowing access with intent to view child pornography. (Doc. 1.) Homeland Security Investigations Special Agent (SA) Jeffrey Armstrong learned that fifteen files qualifying as child pornography had been downloaded by an IP address associated with Defendant. (RT 10/3/19 at 8.)[1]

SA Armstrong obtained a search warrant for Defendant's home, which was executed on May 31, 2016. (*Id.* at 10; Ex. 9.)[2] Federal agents were accompanied by local law enforcement wearing uniforms and tactical vests, and driving a marked patrol vehicles with lights activated. (RT 10/3/19 at 11-12, 56, 57.) Just as the warrant became valid at 6 a.m., SA Armstrong approached Defendant's home with a Marana police officer and rang the doorbell twice. (*Id.* at 11, 12, 18.) There were between twelve and fifteen armed agents (plus four non-agents) present for execution for the warrant, and they arrived in approximately ten vehicles. (*Id.* at 17, 56, 61, 113.) They brought as many agents as possible to streamline the intensive search. (*Id.* at 17-18, 114-15.)

Defendant was startled awake by loud pounding, and he answered the front door. (RT 11/7/19 at 19.) He was wearing only shorts or boxer briefs. (*Id.* at 19-20.) SA

---

[1] "RT" refers to the Reporter's Transcripts of the evidentiary hearing, which the Court refers to by date. (Docs. 44, 58.)

[2] The cited exhibits were provided by the government and admitted at the hearing. The government's exhibits duplicate all Defendant's exhibits upon which the Court relies. (Docs. 54, 55.)

- 2 -

Armstrong spoke with Defendant and informed him they had a warrant to search his home. (RT 10/3/19 at 20, 64, 87.) SA Armstrong detained Defendant and escorted him to the driveway while his roommate was located. (*Id.* at 21, 63; RT 11/7/19 at 20.) The "entry team" had their weapons drawn as they approached the house, but SA Armstrong's weapon was holstered. (RT 10/3/19 at 20, 22.) Defendant saw a battering ram, about ten agents in full tactical gear including guns, and five or six police vehicles blocking the driveway. (RT 11/7/19 at 20, 21, 22.) Four agents entered to find Defendant's roommate, Justin Losado. (*Id.*)

Losado testified he was awoken by armed agents at his bedroom door and told to get on the floor. (RT 10/3/19 at 98-99.) Losado recalled being kept on the living room couch in handcuffs for 20-40 minutes. (*Id.* at 99, 100, 102.) Subsequently, agents removed the handcuffs, he put on pants, and an agent took him to the back patio, where he was later interviewed. (*Id.* at 23-25, 64, 101; Ex. 15.) He had no contact with Defendant during this time period. (*Id.* at 103; RT 11/7/19 at 23.) SA Armstrong intentionally separated the occupants so they could not influence one another. (RT 10/3/19 at 26.) Defendant was not left alone in his home while the warrant was being executed. (*Id.* at 65.) SA Robert McCarthy testified that, if a suspect is present at an unsecured search warrant scene, an agent will remain with him; he cannot roam around freely. (*Id.* at 117; RT 11/7/19 at 6-8, 11.)

After being escorted to the driveway, and once law enforcement had located Losado, Defendant testified he was herded under escort to the master bathroom, passing Losado, who was wearing handcuffs. (RT 11/7/19 at 23, 25.) Defendant testified he was seated on the floor, while SAs Armstrong and McCarthy testified that Defendant sat on the edge of the tub. (*Id.* at 31, 118; RT 11/7/19 at 24.) SA Armstrong was leaning against the counter, and Defendant testified that the door to the six foot-by-six-foot room was essentially blocked by agents. (RT 10/3/19 at 31; RT 11/7/19 at 25, 27.) SA Katherine Gamble also was present. (Ex. 2 at 2.) Defendant remained in only his boxer shorts because no one offered to allow him to get dressed. (RT 10/3/19 at 65-66; RT 11/7/19 at

23, 26.) Defendant could hear a lot of activity happening outside the bathroom, but it was quiet inside the room. (RT 11/7/19 at 39-40.) Agents conducted Defendant's interview in the bathroom in two parts, with a short break in-between.

### a. First Set of Statements

The first recorded interview lasted just over thirty minutes, ending at 6:43 a.m. (*Id.* at 44; Ex. 2 at 43.) Defendant was not informed of *Miranda* rights prior to questioning. (Ex. 2.)

At the outset of the recorded interview, SA Armstrong spent 5 minutes asking Defendant biographical questions, his phone number and email, occupation (HVAC technician), criminal history (essentially none), and education (completed 11th grade). Defendant coherently answered the questions. (Ex. 2 at 2-8.) The agent then stated, "Like I told you, we received information about a child molestation complaint."[3] (*Id.* at 9.) When Defendant asked whether the complaint pertained to him, the SA replied, "I don't know. That's why I'm here." (*Id.* at 10.) Defendant agreed to keep speaking with the agents because, as he informed them, he wanted to know why they were in his home. (*Id.*) SA Armstrong then informed Defendant, "I'm telling you I don't have an arrest warrant for you. Okay? You're free to leave. Okay? But, we do have a search warrant," and Defendant reiterated that he wanted to know whether the search warrant pertained to him or his roommate. (*Id.* at 11.) Before proceeding with questioning, SA Armstrong again told Defendant that he was not under arrest and was free to leave. (*Id.* at 11-12; RT 10/3/19 at 39-40.) Defendant stated that he understood he was not under arrest and acknowledged that he did not feel he was being held. (Ex. 2 at 12-13.)

Defendant then answered several questions about his internet account and computer. (Ex. 2 at 18-21.) When SA Gamble asked how Defendant used his laptop, Defendant asked if she could be replaced with a male agent. (*Id.* at 21.) SA Gamble left and was replaced by SA McCarthy, who testified that he was not wearing a tactical vest.

---

[3] The agent did not and does not have evidence that Defendant was suspected of molestation. (RT 10/3/19 at 59-60, 69.)

- 4 -

(RT 10/3/19 at 115.) Defendant testified that the door was closed after SA Gamble left the room and was not left open until he was released to go; audio reflects the door closing at that time. (Ex. 1; RT 11/7/19 at 32.)

Defendant told the agents that he used his laptop to look at pornography, and the agents asked him numerous questions about his searches, the material he looked at, and the computer used. (Ex. 2 at 22-33.) When SA Armstrong asked about Defendant's phone, Defendant asked if he could text his boss to let him know he would be late. (*Id.* at 34.) SA Armstrong acknowledged Defendant would need to get to work and stated, "in just a minute" and "we'll probably be done shortly." (*Id.*) Defendant was in possession of his boss's keys and he was concerned and embarrassed that his boss might show up while the police were present. (RT 11/7/19 at 28-29.) Defendant's work phone was subject to the search warrant (Ex. 9); SA Armstrong was concerned that, if given access, Defendant could have tried to destroy evidence on the phone. (RT 10/3/19 at 73, 89; RT 11/7/19 at 13-14.)

SA McCarthy informed Defendant they were investigating child pornography and Defendant stated, "[t]hat's what I assumed from what he was saying earlier." (Ex. 2 at 36.) Defendant explained, at the hearing, that he made that connection due to the questions about the internet. (RT 11/7/19 at 50, 52.) Defendant admitted that some child pornography "just kind of came up" during an internet search. (Ex. 2 at 36.) When agents informed him that the law enforcement search would reveal what Defendant had looked for online and that he should therefore "just be honest with" them so that they could "kind of deal with it," he said, "I know I should probably get a – like a lawyer or something." (*Id.* at 39.) Defendant went on to state that he needed help, that he didn't think it was right and did not like it, and it's not who he is. (*Id.*) SA Armstrong attempted to clarify if Defendant was requesting a lawyer or wanted to continue speaking with them and reminded him that he was not under arrest, was free to leave, and could go to work. (*Id.* at 40-41.) SA McCarthy persisted, "You wanna take a break we take a break. You wanna be done be done. You wanna talk we'll talk." (*Id.* at 41.) When SA

Armstrong asked what Defendant meant when he mentioned an attorney, Defendant stated that he didn't know if he needed an attorney, and then stated that he should probably have one. (*Id.* at 42.) The agent ended the interview. (*Id.*) At that time, SA Armstrong believes he told Defendant he was free to leave but that is not included in his report. (RT 10/3/19 at 94-95.) SA Armstrong left the room to check on the status of the search warrant. (*Id.* at 120.)

SA McCarthy remained in the room with Defendant. He testified that the door was at least part way open at that time, but Defendant stated that the door remained closed. (*Id.* at 77, 120; RT 11/7/19 at 32.) Defendant testified that he stood to leave but was told he would have to wait. (RT 11/7/19 at 33-34, 59.) SA McCarthy testified that he did not inform Defendant that he was free to go; however, Defendant did not ask or try to leave. (*Id.* at 9, 11, 15, 76-77.)

Defendant then initiated a conversation about wanting help, and SA McCarthy talked to him about options such as an EAP program through work. (Ex. 3 at 3; RT 10/3/19 at 121-22.) SA McCarthy did not initiate any conversation and the only discussion was about counseling. (RT 10/3/19 at 122; RT 11/7/19 at 9-10.) Defendant testified he was crying during this break and throughout both interviews. (RT 11/7/19 at 34, 65-66.) SA McCarthy did not witness Defendant crying during the first interview or the seven-minute break. (*Id.* at 75-76.) After several minutes, Defendant asked SA McCarthy to have SA Armstrong return. (Ex. 3 at 3; RT 10/3/19 at 121, 122.)

### b. Second Set of Statements

SA Armstrong returned to the bathroom seven minutes after the first interview was terminated. (RT 10/3/19 at 44-45.) SA McCarthy stated for the second recording that, during the break, Defendant expressed concern that he would not get help and the agent suggested contacting the EAP program at work. (Ex. 3 at 3; RT 10/3/19 at 123-24.) SA McCarthy noted that Defendant asked to have SA Armstrong return, and Defendant confirmed those statements as an accurate summary of what had occurred during the unrecorded period. (Ex. 3 at 3; RT 10/3/19 at 123-24.)

SA Armstrong informed Defendant he was not under arrest and could go to work, and provided Defendant with a statement of his *Miranda* rights. (Ex. 3 at 2.) SA Armstrong informed Defendant he would have to complete a *Miranda* waiver if he wanted to reinitiate an interview without an attorney. (*Id.*) Defendant stated, "so-yeah you concluded, um, I don't need a lawyer." (Id. at 3.) SA Armstrong responded, "you're telling me that, right?"; Defendant answered, yes. (*Id.*)[4]

SA Armstrong read Defendant a Statement of Rights, and Defendant stated that he understood and did not need to look at the form. (RT 10/3/19 at 47; Ex. 3 at 4.) SA Armstrong then read Defendant the waiver portion of the form. (Ex. 3 at 4-5.) The standard form uses the language "taken into custody." (Ex. 7.) SA Armstrong changed the language to state that Defendant was detained at 6 a.m. that morning, and he testified that Defendant was briefly detained at the time the agents initially entered the house. (Ex. 3 at 5; RT 10/3/19 at 48, 82-83, 125.)

Defendant then initiated the following discussion:

> Mr. Edwards: Does this mean I can never get a lawyer?
>
> S.A. Armstrong: No, no, no, no, not at all. Not at all.
>
> Mr. Edwards: Just right now. Just –
>
> S.A. Armstrong: You – you can get one right now if you want.
>
> Mr. Edwards: Just right now –
>
> S.A. Armstrong: This is just a –
>
> Mr. Edwards: It just means I can talk to you without a lawyer present; right?
>
> S.A. Armstrong: Right. We need your permission to do so. And this form gives us the permission to – to resume our interview. That's all that form does.
>
> . . . .

---

[4] Defendant later testified that he believed the agents made the choice that he did not need a lawyer because he requested one during the first interview and he wasn't allowed to leave. (RT 11/7/19 at 36, 62.)

>           S.A. McCarthy: With that, Kyle, it's like he said, to answer your
> question, it doesn't waive your rights to get an attorney at any point. It's just
> because you asked for one, we can't discuss further, even if it's –
>           Mr. Edwards: Well, does this really help you guys out?
>           S.A. McCarthy: We're not looking to help us out. Just if you want to
> talk and tell us what's going on, then we're here to listen, and we can – but
> for us to like engage in that conversation, we have to have this.
>           S.A. Armstrong: Right.
>           S.A. McCarthy: But you can get a lawyer later. You can have a lawyer
> now. You can get two questions into our further talks and change your mind.
> I mean, it's whatever you're comfortable with. I mean because you . . . You
> called – you called him back in here. So, it's just whatever you want to do.
> But we can't – we can't proceed further without it, but we don't have to
> proceed further either. So . . .

(Ex. 3 at 5-7.) Defendant then signed the waiver form. (Id. at 8; Ex. 7.) Defendant later testified that he didn't really listen to the *Miranda* waiver because he had been denied a lawyer already. (RT 11/7/19 at 62.)

In response to further questioning, Defendant made several incriminating statements. (Ex. 3 at 8-15.) About ten minutes into the recording, Defendant began crying, which is audible on the recording. (Ex. 1; RT 10/3/19 at 52-53, 127.) Defendant stood up only one time, to get a tissue. (RT 11/7/19 at 11.) Defendant asked to text work before his phone was taken. (Ex. 3 at 12-13.) The agents agreed they would let him text work and get numbers off his phone, and SA McCarthy stated that he would ask to have Defendant's phone prioritized for return to him. (*Id.* at 13.) After providing a few more incriminating answers, Defendant stated that he did not want to talk anymore, and the agents terminated the second interview. (*Id.* at 14-15; RT 10/3/19 at 51.) Defendant testified that he felt he could end the interview because he had given the agents what they wanted. (RT 11/7/19 at 63, 68.) The second interview lasted from 6:50 to 7:07 a.m. (Ex.

3 at 2, 16.) Both agents testified that they did not promise Defendant anything or threaten him (RT 10/3/19 at 52, 127); Defendant provided no contradictory testimony.

SA Armstrong allowed Defendant to get numbers from his phone and Defendant left for work. (*Id.* at 51-52; RT 11/7/19 at 13, 39.) When Defendant left, agents were still conducting the search. (RT 10/3/19 at 53.)

At the suppression hearing, Defendant testified that agents told him where to go, and he was always under escort. (RT 11/7/19 at 32.) He did not believe the statements that he was free to go due to his confinement, the fact that there were so many agents in the house, he was sitting on the floor of the bathroom being interrogated by two agents blocking the door, agents twice denied his request to contact his boss, he remained in his underwear throughout the interviews with no offer to get dressed, and his vehicle was blocked-in by law enforcement. (*Id.* at 27, 32-33, 66-67, 72-73.)

## II. Analysis

Defendant asserts three objections to the R&R's recommendation that the Motion to Suppress statements be denied: (1) Defendant's interview took place in a police-dominated, custodial environment; (2) the pre-*Miranda* statements and continued police-dominated atmosphere tainted the voluntariness of his second interview, negating the effect of the *Miranda* warnings then given; (3) Defendant's waiver of his *Miranda* rights was invalid because it was not knowingly or intelligently given.

### a. Custodial Interview

The Government is precluded from using statements arising from custodial interrogation absent the provision of warnings outlining the person's rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To determine whether a person was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The Court must look at the totality of circumstances and decide whether a reasonable person would "have felt he or she was not at liberty to terminate the interrogation and leave."

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Traditionally, "courts have [] been much less likely to find that an interrogation in the suspect's home was custodial in nature," because "[t]he element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings." *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008). In certain scenarios, however, where the familiarity of the home is converted into a police-dominated environment, a reasonable person "may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." *Id.* ("If a reasonable person is interrogated inside his own home and is told he is 'free to leave' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home.") The Ninth Circuit has highlighted several non-exhaustive factors to consider when conducting a fact-intensive inquiry into whether an interview conducted within the home was custodial:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Id.* at 1084.

Here, there is no question that Defendant was not read his rights at the outset of questioning. Upon reviewing all briefing, transcripts, and audio recordings in this case, the Court does not agree that law enforcement's statements that Defendant was free to go ultimately outweighed the other factors tending to show that Defendant was in a custodial environment during his interview. After collecting Defendant's biographical information, SA Armstrong informed Defendant numerous times that he was free to leave

and that they did not have an arrest warrant for him, and specifically asked Defendant to confirm that he did not feel that law enforcement was holding him there.[5] These statements by law enforcement weigh against a finding of custody, and "greatly reduce[] the chance that a suspect will reasonably believe he is in custody." *Id.* at 1087. But just as in *United States v. Craighead*, additional facts lead the Court in this case to conclude that Defendant "could have reasonably believed he was not free to leave, notwithstanding that SA [Armstrong] told him he was." *Id*. at 1087-89; *see also United States v. Salabye*, 623 F. Supp. 2d 2010 (D. Ariz. 2009) (applying the *Craighead* analysis where defendant was twice told he was free to leave and concluding the interview was custodial); *United States v. Eller*, No. 16-CR-8207, 2020 WL 58589 (D. Ariz. Jan. 6, 2020) (same; concluding that even if defendant had been told he was free to leave, such statements were belied by the facts that it was early in the morning, defendant had no vehicle, defendant could not return to apartment during the search, and it was cold outside).

In *Craighead*, the Ninth Circuit concluded that the defendant had been subjected to a custodial interrogation where eight law enforcement officers from three different agencies armed and in protective gear arrived at the defendant's residence at 8:40 a.m., and where two officers escorted defendant, free from handcuffs, to a storage closet for 20-30 minutes of questioning, during which time defendant sat on a box or chair and one officer stood in front of the door. The Ninth Circuit reached this conclusion even though the agent in that case told the defendant at the outset that he was not under arrest, that he would not be arrested that day regardless of what information he provided, that his statements were voluntary, and that he was free to leave. 539 F.3d 1073.

In this case, Defendant was woken up in his boxers or shorts at 6 a.m. by approximately 18 armed law enforcement officers at his door in full tactical gear, who had arrived in 5 to 10 vehicles, and who had parked so as to obstruct Defendant's driveway. After being detained outside while some of the officers entered his home, he

---

[5] SA Armstrong testified that he additionally informed Defendant that he was free to leave before turning on the audio recording. (RT 10/3/19 at 92-93.) Defendant, in his testimony, did not deny or confirm SA Armstrong's statement.

- 11 -

was "herded" back inside the residence, past his roommate in handcuffs, whom he was not permitted to speak to, and into a 6-foot by 6-foot bathroom, where he took a seat on the floor or the rim of the tub. Throughout the duration of the first interview, the door was "cracked" open, and one agent stood by the door while the other stood directly in front of Defendant. These facts, which by and large mirror those found in *Craighead*, tip the remaining three *Craighead* factors—number of armed officers, restraint by force or coercion, and isolation from others—in favor of a finding of custody.

The approximately 18 officers in Defendant's home would have caused a reasonable person to "believe that the large number of officers was brought for the purpose of preventing his departure," and the facts here suggest that the officers, in conducting their search and occupying the driveway, had "fill[ed] the home such that there [we]re no police-free rooms or spaces to which the suspect may [have] retreat[ed] should he [have] wish[ed] to terminate the interrogation." *Id.* at 1084-85. The officers here were armed and in tactical gear, such that "[a] reasonable person in [Defendant's] position would feel that his home was dominated by law enforcement agents and that they had come prepared for a confrontation." *Id.* at 1085.

Defendant was also restrained and isolated from others. Law enforcement never handcuffed Defendant or otherwise forcefully restrained him, but "[r]estraint amounting to custody may also be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times." *Id.* (citing additional cases from other jurisdictions). Defendant was chaperoned for the entirety of the search and brought into a bathroom with two agents where they spoke to him with the door nearly or completely shut. Although "in many cases, when law enforcement agents conduct an in-home interrogation while conducting a lawful search of the home, physical control of the suspect will be necessary to preserve evidence and protect the safety of the agents," "[t]he fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody." *Id.* at 1986.

Moreover, even though Defendant was not handcuffed, his roommate was—which Defendant saw before he was led into the bathroom by law enforcement, and which would have undercut the notion that Defendant was, in fact, free to go. Defendant was kept isolated from his roommate for the duration of the search. *See id.* at 1087 ("it is difficult to see how Craighead was free to leave if he was, apparently, not free to invite others into the storage room of his own house"). Again, though it was necessary to keep Defendant apart from his roommate for purposes of the investigation, that the separation was necessary does not negate the feeling impressed upon a reasonable person in Defendant's shoes that he was being kept apart from his roommate, who was detained in physical restraints, and that he was therefore not truly free to leave. And shortly before being confronted with information that law enforcement was, in fact, investigating Defendant for accessing child pornography, law enforcement asked Defendant whether he had a smart phone. Defendant confirmed that he had an iPhone, and asked to use it to in order to text work to say that he would be late. SA Armstrong replied, "[i]n—in just a minute, like I said." When Defendant pressed that he had to let his employer know, SA Armstrong replied, "Yeah. We'll—we'll probably be done shortly." (Ex. 2 at 34.) The inability to use his phone to contact others, while again, necessary for the investigation, isolated Defendant all the more, and would have given a reasonable person the impression that law enforcement was in control. Given the centrality of cell phones in everyday life, Defendant understandably might have felt reluctant to head elsewhere without his. *Craighead*, 539 F.3d at 1089 ("Craighead testified that he did not want to leave his house entirely, because he did not want to leave the officers alone with his belongings . . . .").

Finally, though the master bathroom might be viewed as less isolating than the "storage room in the back of the house" where the interrogation in *Craighead* took place, *id.* at 1088-89, the bathroom is still more isolating than "a suspect's kitchen, living room, or bedroom," where a "suspect might take comfort in the familiar surroundings of the home and" which might "decrease the sensation of being isolated in a police-dominated

atmosphere." *Id.* at 1088; *see also United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002) ("isolating the defendant from the outside world . . . largely neutralizes the familiarity of the location as a factor affirmatively undermining a finding of coercion"); *cf. United States v. Murray*, 696 F.Supp.2d 1044, 1054-55 (D. Ariz. 2010) (applying *Craighead* and concluding that interview was not custodial even though over ten officers entered the home with weapons drawn where interview was conducted in defendant's "rather spacious backyard").

Additional facts in this case detract from the force of law enforcement's admonitions that Defendant was free to leave, especially when considered in light of the totality of the circumstances just described. Immediately preceding law enforcement's statements that Defendant was free to go and not under arrest, SA Armstrong informed Defendant that the officers were there with a search warrant to investigate a child molestation case, and asked Defendant if he would be willing to discuss the case. Defendant agreed, amidst law enforcement's statements that he could go, expressing that he had just woken up and wanted to clarify who the officers were investigating—him or his roommate—and learn more about why the officers were there. (Ex. 2 at 9-13). Only much later in the conversation, after law enforcement had denied Defendant access to his phone, did SA Armstrong disclose the actual reason that law enforcement was in Defendant's home, stating that law enforcement had come to investigate "inappropriate" pornography on Defendant's computers, later specifying child pornography—prepubescent, clearly underage. (*Id.* at 36-38.) At this point, Defendant confessed to having viewed images of child pornography.

Although law enforcement's initial misleading statement that they had a warrant to investigate evidence of child molestation, and SA Armstrong's later clarification, once Defendant had already detailed his computer use, that law enforcement had information that he had child pornography on his computers, were not so unduly coercive as to render Defendant's statements involuntary, they may have compelled Defendant to speak where he otherwise might not have chosen to. Courts have found relevant the extent to which a

defendant is confronted with evidence of guilt when determining whether an interrogation was custodial. *See United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) ("We have found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone."); *United States v. Kim*, 292 F.3d at 974. Here, Defendant was seated in his bathroom with two law enforcement agents, the door closed, while 16 others searched through his home and electronic devices as he was questioned, and SA Armstrong informed Defendant that they were there to investigate inappropriate photos on site. Standing alone, law enforcement's statement would not have made the interview custodial, but taken as part of the totality of the circumstances, it had some tendency to make the encounter more so rather than less so.

Overall, the circumstances here warranted warning Defendant of his rights. He had been led to a bathroom in his underwear or shorts just after 6 a.m. by two agents, while sixteen others searched his home. His roommate, as far as he knew, was in handcuffs with other agents, kept apart from him. Although told at the outset of the conversation with two agents in a small bathroom that he was "free to go," it is unclear where Defendant would have even gone at that hour, should he have otherwise felt comfortable actually leaving. The alternative was to remain seated in the bathroom not speaking to the agents monitoring his activity—an option that was not affirmatively presented during the interrogation. Defendant's statements made during the first custodial interrogation without *Miranda* warnings will therefore be suppressed.[6]

---

[6] The R&R distinguishes *Craighead* on two bases: 1) the fact that in *Craighead*, the defendant knew that there were multiple law enforcement agencies present and might not have felt like the free-to-leave sentiment from one agency would be shared with the others who might be inclined to stop him, and 2) the fact that here, Defendant expressed a desire to go to work and eventually did. The first basis gives insufficient weight to the many other similarities between this case and *Craighead*, which *Craighead* also relied on in reaching its conclusion that a reasonable person would not have felt at liberty to terminate the interrogation and leave: police presence in the home, restraint through monitoring and confinement in a closet, isolation from others, etc. As to the second basis, the fact that Defendant eventually terminated the interview, the Court does not agree that this proves Defendant felt he was free to go. Defendant departed only after a second interview in which he gave a full confession. That he asked for his phone during the first interview to text work about being late demonstrates that Defendant did not actually feel free to get up and leave for work on time, and the fact that law enforcement denied even this request would indicate all the more to a reasonable person that law enforcement was in control. Notably, between the first and second interviews, Defendant remained in the

### b. Voluntary Statements Made in Second Interview

Defendant objects to the admission of the statements made during the second interview on two related bases: 1) that the involuntariness of the statements made during the first interview necessarily tainted the voluntariness of the second set of statements, negating the effect of the *Miranda* warnings, and 2) that Defendant's waiver of his *Miranda* rights was invalid because it was not given knowingly or intelligently. The Court concludes that statements made during the second interview are admissible.

"A prior *coerced* confession can 'taint' a subsequent one." *Bradford v. Davis*, 923 F.3d 599, 616 (2019) (citing *Oregon v. Elstad*, 470 U.S. 298, 310 (1985)) (emphasis in original). "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Elstad*, 470 U.S. at 314. Rather, "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."[7] *Id.*; *see also Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) (noting that a statement may be voluntarily made but still be given in violation of *Miranda*).

A suspect's confession is involuntary where, taking into consideration all

---

bathroom with an agent positioned between Defendant and the door.

[7] A plurality in *Missouri v. Seibert*, 542 U.S 600 (2004), acknowledged the logic that, involuntarily made or not, "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 613. But the Ninth Circuit identified the holding in *Seibert* as, "when a law enforcement officer interrogates a suspect but does not give a *Miranda* warning until after obtaining a confession or an incriminating statement, a court in deciding whether to suppress a subsequent, postwarning confession must determine whether the warning was *deliberately* withheld." *United States v. Williams*, 435 F.3d 1148, 1160 (2006) (emphasis added). Defendant does not argue that law enforcement deliberately withheld warnings until after his first confession and the record does not support that contention.

circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overborn. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001). Courts consider the following factors when deciding whether a statement was involuntarily made: "the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

The Court agrees with the Magistrate Judge's conclusion that Defendant's statements made during the first interview were not involuntary. The first interview lasted only 30 minutes. *See id.* at 1028 ("Even if we assume that the interrogation lasted all day . . . coercion typically involves far more outrageous conduct"). Although Defendant had no prior experience with the criminal justice system, he was 31, gainfully employed, rented a home, and owned a car—suggesting that he was a relatively stable adult. (Ex. 2 at 2-3, 5-6.) Defendant was not physically restrained or coerced, and was offered water. And though the officers made one misrepresentation at the outset of the interview, they were not unduly aggressive or coercive. *See Haswood*, 350 F.3d at 1029 ("Even misrepresentations by law enforcement, while reprehensible, do not necessarily evidence coercive conduct."); *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011) ("The interrogation techniques of the officer must be 'the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States.'") (quoting *Moran v. Burbine*, 475 U.S. 412, 433-34 (1986)).

Moreover, though Defendant's second interview occurred very shortly after the first, in the same room with the same officers, the interview was at his own request, and his statements were made after law enforcement issued effective Miranda warnings, which Defendant knowingly and voluntarily waived. A waiver of rights, as well as of counsel after invoking that right, is knowing and voluntary if, under the totality of the circumstances, the waiver is "made with a full awareness of both the nature of the right

being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421; *Edwards v. Arizona*, 451 U.S. 477, 482-85 (1981) ("an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation . . . unless the accused himself initiates further communication, exchanges, or conversations with the police"). The government bears the burden of proving a valid waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Here, law enforcement concluded the first interrogation when Defendant expressed interest in speaking with an attorney. SA Armstrong left the bathroom to join the other agents in Defendant's home. As confirmed by Defendant, during the seven-minute period after SA Armstrong left, SA McCarthy and Defendant spoke about a program that might be available through Defendant's employer to help Defendant, presumably with the issues stemming from his computer usage. Defendant on his own volition, without any coercion or pressure from law enforcement, asked SA McCarthy to call SA Armstrong back to the room. Once SA Armstrong had returned, he immediately provided Defendant with a written copy of his Miranda rights and read the rights out loud to Defendant.

Defendant objects to the Magistrate Judge's conclusion that he knowingly and voluntarily waived his rights, arguing that Defendant's questions following the presentation of the waiver statement and the time that elapsed before Defendant signed the form evidenced confusion on Defendant's part. Defendant did, at first, ask whether the form meant that he could never have an attorney. But SA Armstrong clearly and repeatedly responded that Defendant had the right to an attorney—then, and in the future—that law enforcement would not speak to him further if he did not give them permission to do so without an attorney present, and that Defendant was at liberty to ask for an attorney further into the conversation if Defendant changed his mind about speaking with law enforcement. At that point, Defendant signed the waiver. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (holding that a written waiver is strong

proof of its validity). The Court finds that Defendant's waiver was knowing and voluntary, and will therefore deny Defendant's Motion to Suppress as it pertains to statements made during the second interrogation post warnings.

**CONCLUSION**

IT IS ORDERED that the Report and Recommendation (Doc. 59) is ADOPTED in part, as to the exclusion of the second set of statements.

IT IS FURTHER ORDERED that Defendant's Motion to Suppress Statements (Doc. 19) is GRANTED in part, as to statements made in the first interview without warnings, and DENIED in part, as to statements made in the second interview following acknowledgement of warnings.

Dated this 27th day of March, 2020.

_____
Honorable Jennifer G. Zipps
United States District Judge